**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| RANDALL AMADO, *Petitioner-Appellant*, | No. 11-56420 |
| v. | D.C. No. 2:03-cv-00078-PA-E |
| TERRI GONZALEZ, Warden, California Men's Colony, *Respondent-Appellee*. | OPINION |

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted
January 8, 2013—Pasadena, California

Filed October 30, 2013

Before: William A. Fletcher and Johnnie B. Rawlinson,
Circuit Judges, and Alvin K. Hellerstein, Senior District
Judge.[*]

Opinion by Judge Hellerstein;
Dissent by Judge Rawlinson

---

[*] The Honorable Alvin K. Hellerstein, Senior District Judge for the U.S. District Court for the Southern District of New York, sitting by designation.

## SUMMARY[*]

### Habeas Corpus

The panel reversed the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition challenging a murder conviction based on a violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

Reviewing de novo because the highest state court only considered state law in denying relief to petitioner, the panel held that the prosecution violated *Brady* by suppressing material impeachment information about its witness, Warren Hardy. The panel held that it would have reached the same conclusion under a deferential standard of review. The panel also held that petitioner was prejudiced because Hardy's statements were critical to the conviction, because Hardy was the only person to testify that petitioner brought a weapon to the scene, thus differentiating him from just a member of a crowd of onlookers after the shooting.

Judge Rawlinson dissented. She would hold that the state court did not unreasonably apply *Brady*, that the record supports the aiding and abetting theory of conviction whether or not petitioner had a weapon, and that there was no prejudice to petitioner given the witness' extensive self-impeachment and the existence of other witnesses who attested to petitioner's aiding and abetting in the crime.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

John Lanahan (argued), San Diego, California, for Petitioner-Appellant.

Kamala D. Harris, Dane R. Gillette, Lance E. Winters, Kenneth C. Byrne, and David A. Wildman (argued), Office of the Attorney General of California, Los Angeles, California, for Respondent-Appellee.

## OPINION

HELLERSTEIN, Senior District Judge:

Violence between street gangs is a scourge to communities. The prosecutors who prosecute crimes committed by these gangs perform a vital service. But prosecutors must be vigilant that excessive zeal does not violate a defendant's constitutional right to a fair trial. When that occurs, the courts must balance the needs of the community with a defendant's constitutional right to a fair trial.

Randall Amado was convicted in 1998 by a Los Angeles jury of aiding and abetting a senseless murder in a public bus. The prosecutor neglected, however, to discharge his obligation to disclose material information that would have enabled defense counsel to impeach the credibility of a critical witness against Amado. We hold in this opinion that the prosecution's failure, in violation of clearly established federal law as determined by the U.S. Supreme Court, requires that Amado be given a new trial.

# I.   The Facts of Record and the Prior Proceedings

## A.  The Shooting

In 1996 and 1997, the Bounty Hunter Bloods and 118 East Coast Crips were rival street gangs in southern Los Angeles. Some members of the Bounty Hunter Bloods gang attended Centennial High School, and traveled to and from school on public bus No. 53 through neighborhoods claimed by the 118 East Coast Crips.  The gang members identified themselves by the colors of their clothing: red for the Bloods, and blue for the Crips.  As bus No. 53 passed through the Crips' neighborhoods, members of the Bloods gang on board frequently taunted, flashed gang signs at, spit at, and threw objects at Crips gang members standing at the bus stops.

On January 15, 1997, two members of 118 East Coast Crips, Robert Johnson and Wilbert Pugh, decided to retaliate. Their friend, Nicholas Briggs, overheard the two propose that a large group of Crips board bus No. 53 and attack Bloods members inside.  Briggs testified that Johnson carried a gun at that meeting, but that there was no discussion of shooting anyone.  Johnson and Pugh decided that the attack would occur the next day, but Briggs had a court appearance to attend and declined to join them.

The following afternoon, Johnson, Pugh, and a group of their friends met near the intersection of Imperial Highway and Avalon Boulevard.  When a No. 53 bus approached, at about 3:20 pm, Pugh yelled "Y'all ready?" and the group moved toward the bus as it pulled into a bus stop.  Pugh and at least one other unidentified gang member boarded the bus, and Pugh cursed the Bounty Hunter Bloods members in the

back. One of the Crips, possibly Pugh, shouted "Shoot this m_____ f_____ bus up," and the Crips exited. Johnson, behind the bus, poked a gun through the rear window, aimed at a passenger dressed in red, and fired, hitting two others. Corrie Williams, a student at Centennial High School, was shot in the neck and killed. Tammy Freeman, her friend, was shot in the arm. The bus driver sped off, stopping a few blocks away when he felt it was safe.

## B. The Arrest and Prosecution

Amado was arrested with Briggs the next night. At the time, Amado and Briggs were drinking and smoking marijuana in a backyard near the location of the shooting, and across the street from Amado's home. Johnson and Pugh fled to Milwaukee, Wisconsin. Johnson was arrested in Milwaukee approximately a week after the murder, and he confessed to the shooting. Pugh was also arrested in Milwaukee, although not until a year after the bus attack occurred.

Amado was indicted in Los Angeles County Superior Court on charges of first degree murder, premeditated attempted murder, assault with a firearm, and shooting at an occupied motor vehicle. The prosecution accused Amado of aiding and abetting the shooting by running with Crips gang members to ambush and surround the bus, and by carrying a gun to the scene.

The court and prosecution were concerned about intimidation of witnesses, and retaliation against those who testified. This fear was driven in part by the fact that Pugh was still at large at the time the proceedings began. Based on

interviews of witnesses in camera, the Superior Court ordered that the addresses and phone numbers of witnesses be withheld from the defense, and that the prosecution make witnesses available for interviews by the defense at the courthouse. Warren Hardy was one of those witnesses, but Amado's trial counsel, Richard Lapan, did not interview him.

Pugh, Johnson, and Amado were tried together before two juries, one for Johnson, the alleged shooter, and the second, for Pugh and Amado, the alleged aiders and abettors. While many witnesses testified as to Pugh's and Johnson's roles in the shooting, the evidence against Amado was more limited. Two witnesses testified that Amado was part of the group that gathered at the bus stop. John Grisson, a high school classmate of Amado, testified on direct that he was at the intersection of Imperial Highway and Avalon Boulevard, and saw Amado, with others, running toward the bus. However, when pressed on cross Grisson testified that when he had seen Amado with the group it had been a few minutes before the shooting, and that he did not see Amado run toward the bus prior to the shooting, or away from the bus after the shooting. The second of the two witnesses, Natasha Barner, Pugh's girlfriend at the time of the shooting, testified that she saw Amado, along with a crowd, "coming across the street" toward the bus stop prior to the shooting.[1] Barner said that she did not see Amado with a gun. Barner, corroborated by another witness, testified that she knew only that Johnson and

---

[1] Contrary to the dissent's suggestion, neither Grisson nor Barner testified that they saw Amado board the bus. The two stated only that Amado was among the group of six to eight teenagers at the bus stop. Most witnesses testified that only two of those teenagers boarded the bus. Pugh was identified as one of the two. No witness testified that Amado was the other.

Pugh were members of 118 East Coast Crips, and no witness testified that Amado was a member of the gang. Amado, however, did have the nickname "Bang," which some viewed as a gang moniker.

Warren Hardy, who originally identified himself to the police as Warren Collins, was the key witness against Amado. Hardy lived less than a block from the intersection of Imperial Highway and Avalon Boulevard. Hardy testified that, from his balcony, minutes before the shooting and from a distance of approximately 35 feet, he saw a short, chubby boy with slicked-back hair and a pony-tail carrying a handgun and trailing a group of teenagers heading towards Avalon Boulevard. Hardy testified that he then heard gunfire, and, shortly after, he saw several of these same teenagers run down the street. The next night, Hardy testified, he heard several teenagers behind his building talking and laughing about the shooting. Hardy testified that he called the police, who responded, found Amado and Briggs in the area where Hardy had placed the laughing teenagers, and arrested them.

At trial, Hardy could not identify Amado, neither as the person who he said had carried a gun, nor as one of the teenagers who had gathered the next night behind his building. The best that Hardy could do was to identify Amado's hairstyle as similar to the hairstyle of the person he saw with the gun. On cross examination, Hardy testified that his vision was poor, that he could not remember key details about what he saw behind his building, and that he did not want to testify because he feared for his safety.

Because of Hardy's reluctance to testify and his lack of memory, the prosecution called LAPD Detective Michelle

Esquivel to testify about statements Hardy made the day after the shooting, at the time of Amado's arrest. Esquivel, reading from the notes she had taken while interviewing Hardy, testified that Hardy had identified Amado as the person who had carried a gun to the shooting.**[2]** Esquivel quoted Hardy as describing the teenager as a "light-skinned, chubby male black . . . [with] a blue short-sleeved shirt, and his hair was long, slicked back." Esquivel wrote that when the police informed Hardy that Amado and Briggs had been arrested, a fellow detective asked if they "had the correct guys," and Hardy answered, "Yes."

During closing arguments, the prosecution emphasized Hardy's statement to the police that Amado carried a gun as reliable evidence of his guilt:

> Now, what did Mr. Hardy say? Randall Amado or somebody that looks like him is the guy that he saw on January the 16th, 1997, carrying a gun. The only reason why he is going to say that, or say words to the effect of he's possibly the guy that did the shooting is because he thinks that's the guy who he saw on January the 16th, 1997, with a gun. That's the only reason why you make that statement. The only reason. Now, why is Randall Amado carrying a gun to a fistfight? Is it

---

**[2]** California law allows prior inconsistent statements of a witness to be admitted into evidence, even if not made under oath. *See, e.g.*, *People v. Ledesma*, 140 P.3d 657, 710 (Cal. 2006) (affirming the trial court's decision to allow a police officer to testify as to his prior conversation with a witness after that witness testified that he could not remember the conversation).

because he himself thought this could possibly evolve into something else other than a fistfight?  And if so, did he think in his own mind that the natural and probable consequences of agreeing to get into a fight could result in a shooting, so I better have myself armed before I go over there?

On November 30, 1998, Amado was convicted of all charges.  He was sentenced to 27 years to life in prison.

## C.  Amado's Motion for a New Trial and His Appeal

After the jury's verdict of Amado's guilt, a copy of a probation report on Warren Hardy came into the possession of Lapan, Amado's trial counsel.[3]  The report disclosed that Hardy had pleaded guilty to committing a robbery,[4] that he was on probation for that offense, and that Hardy had been a member of the Piru Bloods, an affiliated Bloods gang.  The prosecution had not disclosed those facts, or given the probation report on Hardy to Amado's counsel.  Lapan then interviewed Hardy, and Hardy wrote out a declaration (the "Hardy declaration") stating that he had been convicted of robbery "out of the Long Beach court" and that he had been a member of the Piru Bloods.[5]

---

[3] Lapan did not disclose how the probation report came into his possession, stating only that he did not obtain it "until after trial."

[4] The record is not clear as to when Hardy was convicted.  Lapan represented to the Superior Court that Hardy plead guilty to robbery in 1996.  In his declaration, Hardy said he was convicted of robbery in 1997.

[5] The declaration was dated January 21, but lacked a year.

Amado moved for a new trial on the ground that the prosecution had violated *Brady v. Maryland*, 373 U.S. 83 (1963), in failing to disclose Hardy's probation report. At a hearing held January 25, 1999, Lapan presented the Hardy declaration and represented that he had "just received [Hardy's] file on the robbery when he pled guilty in 1996 that indicated he was a Piru Blood." Lapan argued that there was a reasonable probability that the result of the trial would have been different had this "newly discovered evidence" been available to impeach Hardy, and that Amado was entitled to a new trial under *Brady*. The State countered that Lapan had failed to diligently pursue information about Hardy and therefore Amado was not entitled to a new trial, and that the new evidence would not change Hardy's credibility. The State argued, based on how "the testimony played out and the way that Mr. Hardy was found by the police and the way that he came forward, it's just not a situation where Mr. Hardy's credibility on what he testified to is going to be changed by the introduction of this new evidence."

The Superior Court held that, even though Hardy's prior conviction should have been disclosed to the jury, doing so would not have changed the result. The court concluded that other witnesses had placed Amado at the scene and that Hardy had been cross-examined vigorously as to his observations:

> Mr. Hardy is not the only person who put Mr. Amado at the scene. I don't think that any more aggressive cross-examination—and he was aggressively cross-examined on behalf of Mr. Amado by Mr. Lapan about his observations and his ability to perceive, and I think that the jury had the benefit of

everything that they possibly could have short of the information of the robbery, which in a perfect world they should have had. But I don't know that it reaches the level that warrants a new trial. I therefore am going to respectfully deny the motion before me for new trial.

Amado appealed to the California Court of Appeal, Second Appellate District. In response to concerns expressed by the appellate court at oral argument, Amado moved to augment the record to document that the Hardy impeachment evidence was "newly discovered." Defense counsel Lapan supported his motion by including the Hardy declaration and his own declaration (the "Lapan declaration") which stated that Lapan had received no information from the prosecution about Hardy's criminal background and gang affiliation and that "I did not learn until after trial that Warren Hardy was on felony probation as a result of a robbery conviction and that in the probation report from that offense, Hardy stated that he was a 'Piru Blood.'" The appellate court granted Amado's motion to augment the record.

In a June 14, 2001 unpublished opinion, the California Court of Appeal affirmed the Superior Court's denial of Amado's motion for a new trial, but on different grounds. The Court of Appeal, citing California Penal Code § 1181(8)[6]

---

[6] [T]he court may, upon his application, grant a new trial . . . [w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected

and relying on *People v. Martinez*, 685 P.2d 1203 (Cal. 1984), a state-law case that interprets that statute, held that the procedural requirements for moving for a new trial had not been satisfied, and that the Hardy declaration failed to "establish that the evidence [on Hardy's background] is indeed newly discovered." Furthermore, the Court of Appeal ruled that Amado failed to "establish that defense counsel could not have discovered the impeaching facts in the exercise of due diligence." As to defense counsel Lapan's representation that he had not learned of Hardy's prior felony conviction, probation status, and gang affiliation until after trial, that was not admissible evidence, for attorney Lapan "was making argument, not testifying under oath." The Court of Appeal concluded that "Amado failed to produce *any* evidence to establish that the impeaching facts about Hardy were newly discovered and could not have been discovered and produced at trial in the exercise of due diligence, let alone the best available evidence."[7]

Amado filed a petition with the California Supreme Court to review the Court of Appeal's decision, but the Supreme Court denied the petition. Amado thus "exhausted the remedies available" in the California courts. *See* 28 U.S.C. § 2254(b)(1)(A).

───────────

to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as, under all circumstances of the case, may seem reasonable."

   [7] The Court of Appeal also affirmed the Johnson and Pugh convictions, holding, among other things, that there was sufficient evidence to convict.

### D.  Amado's Habeas Petition

Amado filed a petition for a writ of habeas corpus with the U.S. District Court, Central District of California on January 6, 2003.  *See* 28 U.S.C. § 2254.  On May 16, 2003, the magistrate judge assigned to the case issued a Report and Recommendation ("R & R"), recommending that Amado's petition be granted because the prosecution had violated Amado's constitutional rights under *Brady*.  The R & R found that "the undisclosed *Brady* evidence was 'substantial and was far more damaging to [Hardy's] credibility than the impeachment evidence available to the defense at trial.'" (quoting *Benn v. Lambert*, 283 F.3d 1040, 1055 (9th Cir. 2002)).

The R & R lay in the district court for more than six years without action.  On December 14, 2009, Amado filed an application for a ruling by the district court, but 19 more months passed before any decision.  On July 20, 2011, eight-and-a-half years after Amado filed his petition, the district court issued an order denying Amado's petition, and denying as well Amado's request for a Certificate of Appealability. *See* 28 U.S.C. § 2253.  Applying a deferential standard of review, the court held that it was reasonable for the California courts to find that the State had not suppressed evidence, since Amado's trial counsel had had an opportunity to speak with Hardy, but had failed to do so.  The court ruled also that Amado had not demonstrated prejudice "[i]n light of the substantial evidence against Petitioner on the prosecution's aiding and abetting theory."

Amado filed a notice of appeal on August 16, 2011.  This Court granted a Certificate of Appealability on September 22,

2011 as to one issue: "whether prosecution's suppression of impeachment evidence violated appellant's right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963)." We have jurisdiction to hear Amado's appeal under 28 U.S.C. §§ 1291 and 2253.

## II.  Discussion

### A.  Standard of Review

#### 1.  The Requirements of AEDPA

Generally, federal courts apply a deferential standard of review in habeas cases.  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), if a claim was "adjudicated on the merits in State court proceedings," a writ of habeas corpus may be granted only if the state court adjudication:

> resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  In contrast, if a claim was not "adjudicated on the merits" in state court, the review is de novo. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). If a federal claim was presented to the state court and the state court denied all relief, "it may be presumed that the state court

adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 131 S.Ct. 770, 784–85 (2011). This presumption is rebuttable, for example, if "the state standard is quite different from the federal standard" or "if a provision of the Federal Constitution or a federal precedent was simply mentioned in passing in a footnote or was buried in a string cite." *Johnson v. Williams*, 133 S.Ct. 1088, 1096 (2013).

Determining whether a claim was "adjudicated on the merits" is not always a simple endeavor. Often, there are two or more lower court decisions relevant to a habeas petitioner's claim. In those cases, we look to the decision that "finally resolves" the claim at issue in order to determine whether that claim was adjudicated on the merits. As we have held, a claim is "adjudicated on the merits" if it is "a decision finally resolving the parties' claims . . . that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001)). Thus, AEDPA deference does not apply where a lower state court addresses the merits but the state appellate court fails to do so. *See Thomas v. Horn*, 570 F.3d 105, 114–17 (3d Cir. 2009) (concluding there has been no "adjudication on the merits" in this situation because the state lower court decision did not "finally resolve" the petitioner's claim); *Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997) (reaching the same conclusion on the grounds that "the last state court to issue an opinion" is the focus of the inquiry) (following *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991)); *see also Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005) ("[F]ederal court[s] should review the last decision in

isolation and not in combination with decisions by other state courts.").

Another complexity occurs where a state court rules on one element of the claim but not on others.  In that situation, the Supreme Court has said that federal courts should apply a de novo standard of review to the elements of a claim on which the state court did not rule.  In *Wiggins v. Smith*, 539 U.S. 510, 534 (2003), for example, the Supreme Court applied a de novo standard to the prejudice prong of an ineffective assistance of counsel claim where the state court addressed the deficiency prong of that claim but never addressed the prejudice prong.  *See also Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (following *Wiggins*).    In *Harrington*, the Supreme Court held that where a state court denies relief in a one-sentence summary order, federal courts should still apply the AEDPA deferential standard of review to the state court ruling.  131 S.Ct. at 785.  In so holding, the Supreme Court stated in dicta—and without reference to *Wiggins* or *Rompilla*—that "§ 2254(d) applies when a 'claim,' not a component of one, has been adjudicated."  *Id.* at 784. Based on this language, the Eleventh Circuit has questioned whether *Rompilla* remains good law on this point, but has not actually decided the issue.  *See Childers v. Floyd*, 642 F.3d 953, 969 n.18 (2011) (en banc), *cert. granted, judgment vacated*, 133 S. Ct. 1452 (2013).  In contrast, both the Sixth and Seventh Circuits have concluded that *Harrington* did not change the Supreme Court's prior holdings.  *See Rayner v. Mills*, 685 F.3d 631, 639 (6th Cir. 2012) ("[Supreme Court cases] mandate AEDPA deference to both prongs when the state court decision summarily dismisses the claim without explanation; when a state court decision relies only on one prong, the cases mandate AEDPA deference to that prong and

de novo consideration of the unadjudicated prong."); *Sussman v. Jenkins*, 642 F.3d 532, 534 (7th Cir. 2011) ("We certainly cannot assume that the Court overruled *sub silentio* [in *Harrington*] its holding in *Wiggins*—a precedent so important to the daily work of the lower federal courts.").

## 2. The Standard of Review in This Case

The threshold issue is the standard by which we are to review the decision of the California Court of Appeal, whether to defer to its rulings, review them de novo, or perform our review according to some combination of both standards. Although neither party in its briefs addressed the issue of the proper standard of review, we have the obligation to apply the correct standard, for the issue is non-waivable. *See Gardner v. Galetka*, 568 F.3d 862, 879 (10th Cir. 2009) ("We agree with our sibling circuits that the correct standard of review under AEDPA is not waivable."); *Brown v. Smith*, 551 F.3d 424, 428 n.2 (6th Cir. 2008) ("[A] party cannot 'waive' the proper standard of review by failing to argue for it."), *overruled on other grounds by Cullen v. Pinholster*, 131 S.Ct. 1388, 1400 (2011); *Eze v. Senkowski*, 321 F.3d 110, 121 (2d Cir. 2003) (holding that AEDPA's deferential standard of review applied even where the State failed to argue for its application); *Worth v. Tyer*, 276 F.3d 249, 262 n.4 (7th Cir. 2001) ("[T]he court, not the parties, must determine the standard of review, and therefore, it cannot be waived."). As the Tenth Circuit characterized the issue, "[i]t is one thing to allow parties to forfeit claims, defenses, or lines of argument; it would be quite another to allow parties to stipulate or bind us to application of an incorrect legal standard, contrary to the congressional purpose." *Gardner*, 568 F.3d at 879. Because we look to the case that "finally resolv[ed]" Amado's claim,

we examine the California Court of Appeal's decision, not the Superior Court's decision, to determine whether Amado's claim was "adjudicated on the merits." *Lambert*, 393 F.3d at 969.

The Court of Appeal noted, first, that the appeal by Amado was for a new trial pursuant to Section 1181(8) of the California Penal Code. That section, quoted at note 6, supra, provides for a new trial based on newly discovered evidence if the new evidence is "material," and if the defense could not, "with reasonable diligence, have discovered and produced [it] at the trial."[8]   In interpreting Section 1181(8), the Court of Appeal relied on two decisions that had addressed the statute: (1) *People v. Martinez*, 685 P.2d 1203, 1208–09 (Cal. 1984), a decision of the California Supreme Court that found that although the statute's requirement of "due diligence" served an important public policy, it should not be given "a strict enforcement"; and (2) *People v. Arguello*, 390 P.2d 377, 379 (Cal. 1964), an earlier decision of the California Supreme Court that similarly relied on the due diligence requirement.

Next, the Court of Appeal ruled that Amado's counsel was not duly diligent, as Section 1181(8) required. The Court of Appeal ruled that counsel's representation to the Superior Court, that the impeachment evidence against Hardy was newly discovered, was not of evidential quality because counsel "was making argument, not testifying under oath," and thus did not satisfy the showing for a new trial required

---

[8] Section 1181(8) requires also that defendant produce at the hearing "the affidavits of the witnesses by whom such evidence [the newly-discovered evidence] is expected to be given."

by Section 1181(8).[9]  In effect, the Court of Appeal found that
Amado was required to produce evidence that showed that the
"newly discovered evidence" was in fact newly discovered,
and Amado had failed to do so because the evidence that
Amado presented was unsworn.

Thus, the Court of Appeal denied Amado's motion for a
new trial.  But it did so without any consideration of the
requirements of *Brady v. Maryland.*  Its rulings were based
totally on state law, specifically, California Penal Code
§ 1181(8), in relation to the standards for reviewing motions
for a new trial based on newly-discovered evidence.  While
the Superior Court had addressed the merits of *Brady*, the
Court of Appeal ignored the lower court's findings.  The
Superior Court had ruled that the Hardy impeachment
evidence, even if it had been disclosed, would not have
changed the outcome of the trial, and thus the failure to
disclose was not prejudicial to Amado.  The Superior Court
reasoned that two other witnesses had identified Amado as
joining the crowd that ran to the scene of the shooting (even
though none other than Hardy had seen a gun in Amado's
hand).  The Court of Appeal did not comment on this ruling.
The Superior Court also had observed that "in a perfect world
[the jury] should have had" the Hardy impeachment
information.  The Court of Appeal did not comment on this
finding either.  Since the Court of Appeal failed to consider
the decisions of the U.S. Supreme Court on the prosecution's
constitutional obligation under *Brady* to disclose exculpatory
information or, for that matter, anything other than Section

---

[9] The Court of Appeal did not comment on the fact that it had granted
Amado's motion to augment the record, nor did it comment on the
contents of the Lapan declaration.

1181(8) of the California Penal Code, no deference is to be given to its conclusion that Amado is not entitled to a new trial.[10] *See Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

Despite the Court of Appeal's clear focus on Section 1181(8), the State insists that the Court of Appeal did address the merits of *Brady* when it said "[t]he record before us does not establish the prosecution's failure under *Brady* to reveal this information to defense counsel." Read in context, however, this one-sentence statement is a reference to the insufficiency of the Hardy declaration to meet the requirements of Section 1181(8), not a discussion of a *Brady* claim.

---

[10] The California Court of Appeal's reliance on state law raises the question of whether the independent and adequate state law doctrine bars our consideration of this issue. The State does not explicitly argue that this doctrine applies, and therefore has waived this defense. *See Vang v. Nevada*, 329 F.3d 1069, 1073 (9th Cir. 2003). Further, it was not "firmly established" that California Penal Code § 1181(8) requires a party seeking a new trial to submit an attorney's declaration describing when the evidence was discovered, in lieu of an attorney representation corroborating a witness's declaration. *See Lee v. Kemna*, 534 U.S. 362, 376 (2002) (holding that the independent state ground must be "firmly established and regularly followed"). The statute itself does not require such a declaration, nor does the case the California Court of Appeal relied on, *People v. Martinez*, 685 P.2d at 1205, which states only that facts supporting a new trial "be shown by the best evidence of which the case admits." Lapan had reason to believe that his statement to the Superior Court was sufficient without an accompanying declaration because California courts have held that "[s]tatements of a responsible officer of the court are tantamount to sworn testimony." *People v. Wolozon*, 188 Cal. Rptr. 35, 37 n.4 (Cal. Ct. App. 1982) (citing *People v. Laudermilk*, 431 P.2d 228, 238 (Cal. 1967)).

Furthermore, even if the State is correct that the California Court of Appeal addressed the merits of *Brady*, a de novo standard of review would still apply to the issue of whether Amado was prejudiced. The State concedes that the California Court of Appeal did not discuss the issue of prejudice. Where a state court addresses only one element of a claim, federal courts reviewing a habeas petition on that claim apply a de novo standard of review to the elements of a claim that the state court did not discuss. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). Thus, under the State's own theory, the standard of review on the issue of prejudice is de novo even if, as the State argues, a deferential standard of review should apply to the issue of whether the prosecution suppressed evidence in violation of *Brady*.

We next discuss the rule of *Brady*.

## B.  Suppression

### 1.  The Requirements of *Brady*

Under the landmark case of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), prosecutors are constitutionally obligated to disclose "evidence favorable to an accused . . . [that] is material either to guilt or to punishment." This prosecutorial duty is grounded in the Fourteenth Amendment, *id.* at 86, which instructs that states shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The purpose of *Brady* is to ensure that "criminal trials are fair," *Brady*, 373 U.S. at 87, and "that a miscarriage of justice does not occur," *United States v. Bagley*, 473 U.S. 667, 675 (1985). Placing the burden on prosecutors to disclose information "illustrate[s] the special

role played by the American prosecutor in the search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). The prosecution is trusted to turn over evidence to the defense because its interest "is not that it shall win a case, but that justice shall be done." *Id.* (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

The prosecution's duty to divulge relevant information is a "broad obligation." *Strickler*, 527 U.S. at 281. The prosecutor, although "not required to deliver his entire file to defense counsel," is required to turn over evidence that is both favorable to the defendant and material to the case. *Bagley*, 473 U.S. at 675. This duty exists regardless of whether the defense made any request of the prosecution; the prosecution is required to provide material, favorable information even "where the defendant does not make a *Brady* request." *Id.* at 680–82.

Favorable evidence is not limited to evidence that is exculpatory, i.e., evidence that tends to prove the innocence of the defendant. Favorable evidence includes that which impeaches a prosecution witness. In *Giglio v. United States*, 405 U.S. 150, 154 (1972), "the Government's case depended almost entirely" on one witness, yet the prosecution failed to inform the defense that the witness testified in exchange for a promise from the government that he would not be prosecuted. The Supreme Court held that the prosecution was required to inform the defense about its agreement with the witness because "evidence of any understanding or agreement as to a future prosecution would be relevant to [the witness's] credibility and the jury was entitled to know of it," and the Court ordered a new trial. *Id.* at 154–55. The Supreme Court since has made clear that the prosecution must disclose all

material impeachment evidence, not just evidence relating to cooperation agreements.  *See Bagley*, 473 U.S. at 676.

A prosecutor's duty to reveal favorable, material information extends to information that is not in the possession of the individual prosecutor trying the case.  In *Kyles v. Whitley*, 514 U.S. 419, 441–42 (1995), police learned that a witness who implicated the defendant had provided a description of the suspect to the police that did not match the defendant.  The prosecutors were apparently unaware that this exculpatory information even existed.  Still, the Supreme Court held that the prosecutors had violated *Brady*, for they had "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  *Kyles*, 514 U.S. at 437.  This requirement meant that prosecutors had to put in place "procedures and regulations . . . to insure communication of all relevant information on each case to every lawyer who deals with it."  *Id.* at 438 (quoting *Giglio*, 405 U.S. at 154). Interpreting *Kyles*, our circuit has observed that "[b]ecause the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned."  *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (en banc).

The Supreme Court has not tempered the *Brady* obligation of prosecutors by imposing a due diligence standard on defense counsel.  Clearly, defense counsel cannot lay a trap for prosecutors by failing to mention or use favorable impeachment or exculpatory evidence of which they were aware, for the prosecution's failure to disclose that evidence in such a case cannot be said to have "deprive[d] the

defendant of a fair trial." *Bagley*, 473 U.S. at 675. But there is no indication in the case before us that defense counsel knew before or during trial that Hardy had committed a felony, or was on probation, or had been a Piru Blood. Nor, as we discuss in the next section, could defense counsel be expected to know this information without the prosecution's disclosure.

## 2. **Application of the *Brady* Standard**

Under *Kyles*, the fact that the individual prosecutors who brought the case against Amado may not themselves have had the Hardy impeachment material in their possession is not a bar to Amado's *Brady* claim. At oral argument before this Court, the State conceded that the prosecution had access to Hardy's conviction and probation records, for Hardy was prosecuted by the same office that prosecuted Amado, the Los Angeles County District Attorney's Office.[11] Pursuant to *Kyles*, the prosecution had a *Brady* obligation to produce these records. 514 U.S. at 437. *Cf. Giglio*, 405 U.S. at 154 ("To the extent [a *Brady* obligation] places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it.").

At oral argument, the State questioned whether prosecutors had access to records on Hardy's gang affiliation. However, that information was discussed in the very same

---

[11] Hardy stated in his declaration that he was prosecuted in Long Beach. Long Beach falls under the auspices of the Los Angeles County District Attorney's Office.

probation report that discussed Hardy's prior felony conviction. Had the State obtained that report, as the State concedes it was required to do, it also would have discovered Hardy's gang affiliation.

The State argues that Amado's counsel has not sufficiently shown when or how he learned of the *Brady* material that the prosecution failed to produce. However, Lapan's declaration sufficiently states that he did not know this information "until after trial," and there is no reason to question his veracity. Lapan declared: "I did not learn until after trial that Warren Hardy was on felony probation as a result of a robbery conviction and that in the probation report from that offense, Hardy stated he was a 'Piru Blood.'" Lapan similarly represented to the Superior Court that "I didn't know [Hardy] had a prior felony record [at the time of trial]" and "I didn't know he was a Blood." The Superior Court accepted this representation, holding against Amado on different grounds.

The State's primary argument is not that Amado's counsel knew of the Hardy impeachment evidence, but that Amado's counsel should have known about this evidence. The State, relying on several cases from this circuit, contends that Hardy's background was accessible to Amado's counsel and that the State cannot be said to have suppressed information that, with diligence, could have been discovered. For example, in *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991), we stated: "[w]hen . . . a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government" (citing *United States v. Dupuy*, 760 F.2d 1492, 1501 n.5 (9th Cir. 1985)). *See also United States v. Bond*,

552 F.3d 1092, 1096 (9th Cir. 2009) (holding that there is no suppression where defendants have the means of discovering the favorable information on their own and "there was no government action to throw the defendant off the path of the alleged *Brady* information"); *United States v. Bracy*, 67 F.3d 1421, 1428–29 (9th Cir. 1995).

In all of these cases, however, the defendants had been advised specifically of the source and nature of the *Brady* material, and could not complain, having been so advised, that they could not obtain that material. In *Dupuy*, for example, the case that started this line, the prosecutor did not turn over her work product, notes of her conversations with the defendant's co-defendants that contained exculpatory information. However, the court told the defendant to obtain the exculpatory information from the co-defendants themselves, and defendant failed to make a showing that he could not have had full recourse by following the court's suggestion. 760 F.2d at 1501–02. In *Aichele*, the government had given defense counsel a transcript of an interview with a crucial government witness and the witness's rap sheet, but had not also supplied the witness's prison records. 941 F.2d at 764. Similarly, in *Bracy*, the government gave the defense two reports on a government witness's criminal history and a printout from a National Crime Information Center computer search about that witness, but did not provide details about that witness's criminal history in two states. The production, the court ruled, was sufficient. *See* 67 F.3d at 1428. And in *Bond*, the government had given the defendant "the essential factual data to determine whether the witness' testimony might be helpful." 552 F.3d at 1097. These cases hold that there is no violation of *Brady* if the government provides the defendant with the core *Brady* materials and the defendant

fails to show that additional materials would have made a difference at the trial.

In essence, the State interprets its *Brady* duty to require it to produce only what defense counsel shows that it could not have known, and found, on its own. *Brady* is not so limited. Under *Brady*, as clearly established by Supreme Court law, the prosecutor has a "broad duty of disclosure." *Strickler*, 527 U.S. at 281; *cf. United States v. Agurs*, 427 U.S. 97, 108 (1976) (finding that "the prudent prosecutor will resolve doubtful questions in favor of disclosure"). In *Strickler*, the Court noted that "if a prosecutor asserts that he complies with *Brady* through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady*." 527 U.S. at 283 n.23. In other words, if the defense has a good reason to believe that prosecutors are required to turn over a particular piece of information, the defense is not required to hunt down that information on its own.

Here, the prosecution failed to provide any *Brady* material on Hardy. The prosecution never suggested to the defense that Hardy had a criminal background, even though, under California law, as well as under *Brady*, the prosecution must disclose to the defendant "[t]he existence of a felony conviction of any material witness whose credibility is likely to be critical to the outcome of the trial." California Penal Code § 1054.1(d). Moreover, Amado's counsel could not easily have obtained the Hardy impeachment information without the assistance of the prosecution, for it was "the policy of the [California] Department of Justice to release rap sheets only to prosecutors, and defense disclosure requests [were required to] go through the prosecutor's office."

*People v. Little*, 68 Cal. Rptr. 2d 907, 911 (Cal. Ct. App. 1997) (citation omitted). We therefore hold that the prosecution suppressed information on Hardy's criminal background and gang affiliation, in violation of *Brady*.

While we believe a de novo standard of review is appropriate here given that the California Court of Appeal did not address *Brady*, we would reach the same conclusion even if we were to apply a deferential standard of review. Any finding by the California Court of Appeal that the prosecution had not suppressed evidence was an "unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). *Strickler* and *Kyles* show that it is the prosecution's duty to provide material impeachment information to the defense, not the defense's duty to find that information by itself. The California Court of Appeal's finding that Amado was required to demonstrate diligence in obtaining this information is at odds with this Supreme Court case law.

## C. Prejudice

This court next must consider whether Amado was prejudiced as a result of the State's failure to produce the *Brady* information. A defendant is prejudiced if the evidence that was not produced is material. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. The test for materiality "is not a sufficiency of evidence test." *Kyles*, 514 U.S. at 434.

Evidence can be sufficient to sustain a verdict, and still *Brady* can be violated. *Id.* at 434–45. If "the favorable evidence [not produced] could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," *Brady* has been violated. *Id.* at 435.

### 1. The Jurors' View of Hardy

The State withheld not one but three pieces of evidence that had the potential of undermining Hardy's testimony. First, Hardy had a robbery felony conviction. Defense counsel could have argued that this conviction rendered him an untrustworthy witness. Second, Hardy was on probation for that conviction at the time he testified. Defense counsel could have argued that Hardy was seeking favor with his probation officers by helping the police solve a well-publicized murder case. Third, Hardy was a former member of a Bloods gang, and the defense could have argued that Hardy was biased against a member or friend of the rival Crips.

Lapan's cross-examination of Hardy did not address these points, for Lapan, without the suppressed impeachment evidence, lacked a good-faith basis to ask the appropriate questions. Lapan's cross-examination was short, focusing on Hardy's weak vision and his arguable inability to identify people running across his field of vision. The suppressed information would have added to the force of the cross-examination and defense counsel's closing argument. There is a reasonable probability that the suppressed information would have made a difference, causing the jury to view Hardy's implication of Amado with a great deal more suspicion.

The State makes two arguments why the jurors' view of Hardy would not have changed. First, the State argues that Hardy was already impeached by the cross-examination on his weak vision. The suppressed information, however, could have been used to show that Hardy had a motive to embellish the truth, and even to lie. This is an entirely different reason to cast doubt on Hardy's words than the one presented at trial.

The State's second argument is that Hardy's reluctance to testify and limited memory shows that he was not biased against Amado. If Hardy was testifying against Amado in order to win favor with the prosecution, he would have been much more helpful and supplied detailed answers while on the stand, the State reasons. This argument, however, ignores Hardy's cooperation with the police the night after the shooting. Hardy provided substantial assistance to the police on that day, voluntarily calling the authorities and identifying Amado as the teenager he saw with the gun. The details of Hardy's initial implication of Amado were admitted into evidence through the testimony of Detective Esquivel, who helped fill in the gaps of Hardy's sometimes spotty testimony. Thus, Hardy's initial identification of Amado—possibly tainted by Hardy's motives for bending the truth—made it into the mix of evidence considered by the jury.

## 2.  Reasonable Probability of a Different Result

Hardy's statements against Amado, in his testimony and as introduced through Detective Esquivel, were critical to Amado's conviction. Hardy was the only person to testify that Amado brought a weapon to the scene. Without such testimony, it is doubtful if the jury would have found that Amado had the requisite criminal intent to aid and abet

Johnson's attack on the passengers on the bus. Indeed, without such evidence, Amado was just one member of a crowd. Mere presence in a crowd is not sufficient to render a person an accomplice. *See People v. Salgado*, 105 Cal. Rptr. 2d 373, 381–82 (Cal. Ct. App. 2001).

At trial, the prosecution emphasized the critical nature of Hardy's testimony. The prosecutor argued during summation that Hardy's testimony on Amado's carrying of a gun showed he was involved in the "significant amount of planning and talking" about the attack prior to the shooting. The prosecution emphasized that Hardy "specifically describes somebody that looks like Randall Amado, and then later picks that person out the next day." Hardy was the one who "hear[d] people discussing the shooting" and called the police to set the case in motion. The prosecution told the jury that "the only reason" Hardy had to identify Amado was that he truly believed that Amado was "the guy who he saw on January the 16th, 1997, with a gun." Would the prosecutor have argued with such conviction if Hardy had been impeached by his recent robbery conviction, his felony probation status with a motive to curry favor with the authorities, and his past membership in the Bloods, in frequent rivalry and conflict with members of the Crips? The prosecutor's failure to discharge his *Brady* obligations enabled him to bolster Hardy's credibility well beyond the credibility Hardy would have had if all the impeaching information had been made available to defense counsel and, by defense counsel, to the jury.

Relying on California cases that broadly apply accomplice liability to gang members, the State contends that even if Hardy had not testified at all, Amado still could have been

convicted. *See, e.g.*, *People v. Medina*, 209 P.3d 105, 112 (Cal. 2009) (gang member involved in a fistfight responsible for shooting committed by another member of his gang); *People v. Ayala*, 105 Cal. Rptr. 3d 575, 585 (Cal. Ct. App. 2010) (gang member participates in murder when he rides with a fellow gang member to assist him in a beating of a rival gang); *People v. Montes*, 88 Cal. Rptr. 2d 482, 486 (Cal. Ct. App. 1999) (gang member who wielded a chain in a gang fight responsible for shooting committed by a fellow gang member). But without Hardy, the only evidence against Amado was Barner's and Grisson's testimony, which showed that, at best, Amado ran to the bus with others, many of whom were not indicted. On such evidence, it is questionable if a jury could have convicted Amado of intending to facilitate murder. *See Salgado*, 105 Cal. Rptr. 2d at 381–82.

We do not need to decide more than the question before us—whether the prosecutor's violation of *Brady* was prejudicial. The standard is not whether there is sufficient evidence for conviction, but whether there is a "reasonable probability" that the outcome would have been different, meaning that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Here, that standard is met. The impeaching evidence was strong enough to cast a cloud of doubt over Hardy's testimony. With that cloud of doubt, the remaining evidence against Amado was weak. While Barner and Grisson both put Amado at the scene of the crime, neither of them testified that they saw him with a weapon or heard him make any statements, or heard others make statements, that suggested that Amado intended to participate in an assault. There was no proof that Amado had any discussions with Johnson and

Pugh, or had a strong relationship with them that would have suggested that Johnson and Pugh had shared their plan with Amado.  Hardy's testimony that Amado carried a gun was influential to the jury in delivering a verdict against Amado, and it is reasonably probable that a jury, if made aware of the impeaching information against Hardy, would have given little, if any, credence to his testimony and would have returned a different verdict.

## III.    Conclusion

In failing to disclose material impeaching evidence to Amado before or during trial, the State violated Amado's right to due process under *Brady*.  Amado is entitled to a new trial.  We reverse and remand with instructions to grant the writ of habeas corpus and release Amado from custody unless the district attorney of Los Angeles County, within 60 days, initiates proceedings for a new trial.

**REVERSED and REMANDED.**

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent from the majority's conclusion that the state court's denial of Randall Amado's *Brady*[12] claim entitles Amado to habeas relief.  As the majority acknowledges, this case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  *See Majority Opinion*, p. 14.  Under the strictures

---

[12] *Brady v. Maryland*, 373 U.S. 83 (1963).

set forth in AEDPA, our review of state court rulings is severely cabined. Under AEDPA, even *de novo* review is not really *de novo*. Rather, we review the state court decision for reasonableness. Only if the state court decision is objectively unreasonable is habeas relief warranted. *See Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003). Habeas relief is *not* warranted simply because we think the state court got it wrong. Rather, under AEDPA we must give deference to the state court decision, affording state courts "the benefit of the doubt . . ." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

As the United States Supreme Court emphasized in *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011), "an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the [*Brady*] standard itself." (citation and internal quotation marks omitted).

In *Richter*, we were reminded that "[a] state court's determination that a claim lacks merit precludes federal habeas relief, so long as fairminded jurists could disagree on the correctness of the state court's decision. . . ." *Id*. at 786 (citation and internal quotation marks omitted). The Supreme Court cautioned us: "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (citation omitted).

The Supreme Court left no doubt that habeas relief should not be granted readily, stating in no uncertain terms: "If [the habeas] standard is difficult to meet, that is because it was meant to be. . . ." *Id*. The Supreme Court explained that

AEDPA stopped just short of completely prohibiting relitigation in federal court of claims of error that were previously rejected in state court. *See id*. The Supreme Court clarified that AEDPA only "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents. It goes no farther." *Id*. Rather than providing a pathway to second guessing state court decisions, habeas corpus as amended by AEDPA "is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . ." *Id*. (citation and internal quotation marks omitted).

Finally, we must keep in mind that the more general the rule being applied, the more leeway the state has to apply the rule in case-by-case applications. *See id*. *Brady* is a rule of general application, *see United States v. Bagley*, 473 U.S. 667, 682–83 (1985) (adopting the broad prejudice standard established in *Strickland v. Washington*, 466 U.S. 668 (1984), for *Brady* materiality analysis); *see also Cobb v. Thaler*, 682 F.3d 364, 381 (5th Cir. 2012) ("[L]ike *Brady's* disclosure requirement, the materiality standard is a general rule, meaning a wide range of reasonable applications exist. . . .") (citation omitted). Accordingly, we must afford the state courts considerable leeway in applying the principles articulated in the *Brady* decision. We must also keep in the forefront of our analysis the limitations of our review. The majority's conclusion simply cannot be reconciled with these precepts.

Amado was convicted as an aider and abettor, which means that the prosecutor had no obligation to prove that

Amado fired the shots that killed one victim and wounded another. *See, e.g.*, *People v. Salgado*, 88 Cal. App. 4th 5, 15 (2001) ("Aiding and abetting requires a person to promote, encourage or instigate the crime with knowledge of its unlawful purpose.") (citations omitted). Therefore, any testimony regarding whether Amado had a gun was not material. *See Banks v. Dretke*, 540 U.S. 668, 698 (2004) (defining materiality in terms of its potential effect on the outcome of the case).

Unlike the majority, I focus my analysis on whether the state court's denial of relief was objectively unreasonable, not whether Amado suffered prejudice in the first instance. *See Richter*, 131 S. Ct. at 785 (cautioning against directly reviewing the federal rule rather than reviewing the state court's application of that rule). Viewed through that prism, I cannot say that no fairminded jurist could disagree that the state court's decision was unreasonable, and neither should the majority. *See id*. at 786; *see also Wiggins*, 539 U.S. at 520–21 (incorporating the "objectively unreasonable" standard). The state court applied *Brady*, a rule of general application, thereby implicating the considerable leeway contemplated by the Supreme Court to review of the resulting determination. *See Richter*, 131 S. Ct. at 786.

I agree with the presumably fairminded district court that the state court did not unreasonably apply *Brady*. On the issue of prejudice, which is the fulcrum of the majority's analysis, the record reflects that there was testimony, other than that of Warren Hardy, to support the aiding and abetting theory of conviction. Natasha Barner identified Amado as part of the group at the bus stop who boarded the bus to confront rival gang members. Witness John Grisson also

identified Amado as among the "group of guys" who "ran across the street" toward the bus stop where the shooting occurred, boarded the bus, and fled following the shooting.

The record also reveals that Hardy was far from being a stellar witness for the prosecution. As the district court observed, Hardy endeavored to recant his testimony at every turn. He could not "remember the face" of the individual he previously identified as having a gun. He could not remember identifying anyone to the police. Hardy also confirmed that he did not witness the shooting and that he failed to identify Amado from a photograph that was presented to him during the trial. Given Hardy's extensive self-impeachment and the existence of other witnesses who attested to Amado's aiding and abetting of the shooting, it was not objectively unreasonable for the state court to find a lack of prejudice to Amado, *i.e.*, that the undisclosed evidence would not have affected the jury's verdict. *See Stickler v. Greene*, 527 U.S. 263, 293–94 (1999); *see also Richter*, 131 S. Ct. at 786 ("[H]abeas corpus is a guard against *extreme* malfunctions in state criminal justice systems, not a substitute for ordinary error correction through appeal. . . .") (citation and internal quotation marks omitted) (emphasis added). In view of the "deference, latitude and leeway" we are to afford the state court's application of the *Brady* rule, *id.*, it is hard to comprehend how one could conclude that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786–87.

Were the full feast of direct review spread before us, we would be free to gnaw away at the state court's *Brady* ruling.

*See, e.g.*, *United States v. Sedaghaty*, No. 11-30342, — F.3d —, 2013 WL 4490922, at \*9–\*12 (9th Cir. August 23, 2013) (reviewing *Brady* issue on direct appeal without deference to the trial court's ruling). However, the Supreme Court has told this Circuit specifically, emphatically, and in no uncertain terms, to curb our appetite when it comes to habeas review. *See Richter*, 131 S. Ct. at 785–86 (chastising this Circuit for conducting a *de novo* review with no deference to the state court decision).

I respectfully decline to join a ruling that so clearly flouts Supreme Court precedent. With respect, I dissent from the majority opinion.