FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NELSON HERNANDEZ,
*Petitioner-Appellant*,

v.

KIM HOLLAND, Warden,
*Respondent-Appellee.*

No. 11-55337

D.C. No.
2:07-cv-07036-DSF-AGR

OPINION

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
November 4, 2013—Pasadena, California

Filed April 24, 2014

Before: Diarmuid F. O'Scannlain, Susan P. Graber,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

## SUMMARY[*]

### Habeas Corpus

The panel affirmed the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition alleging a violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), based on a mid-trial conversation between petitioner and a court bailiff.

During a recess in his trial, petitioner had a conversation with a court bailiff during which he made inculpatory statements about the details of the crime. The trial court ruled that the conversation was not an "interrogation" and permitted the bailiff to testify to the jury. The panel held that this determination did not involve an unreasonable application of *Miranda* or its Supreme Court progeny. The panel also held that, despite respondent's failure to brief the issue, the deferential standard of review under the Anti-Terrorism and Effective Death Penalty Act cannot be waived.

### COUNSEL

Michael Weinstein (argued), Deputy Federal Public Defender; Sean K. Kennedy, Federal Public Defender's Office, Los Angeles, California, for Petitioner-Appellant.

Tannaz Kouhpainezhad (argued), Deputy Attorney General; Kamala D. Harris, Attorney General of California; Dane R. Gillette, Chief Assistant Attorney General; Lance E. Winters,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Senior Assistant Attorney General; Michael R. Johnsen, Supervising Deputy Attorney General, Los Angeles, California, for Respondent-Appellee.

---

## OPINION

BEA, Circuit Judge:

We must decide whether, in the context of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, a mid-trial conversation between a court bailiff and a criminal defendant constituted an interrogation that must be preceded by a *Miranda* warning. We decide that the state court's determination that the conversation was not such an inquiry was reasonable.

Petitioner Nelson Hernandez seeks habeas relief from his state murder conviction on the ground that his right against self-incrimination under *Miranda v. Arizona*, 384 U.S. 436 (1966), was violated. During a recess in his trial, Hernandez had a conversation with the court bailiff. Hernandez made inculpatory statements about details of the crime. The trial court, over Hernandez' objections, ruled that the conversation was not an "interrogation" under *Miranda* and permitted the bailiff to testify to the jury about the statements. On direct appeal, the California Court of Appeal, in a reasoned decision, also held that the conversation was not an "interrogation" under *Miranda*. The Los Angeles County Superior Court, California Court of Appeal, and the California Supreme Court later denied Hernandez' state habeas petitions without opinion. The district court then denied Hernandez' federal habeas petition under AEDPA, holding that the California Court of Appeal on direct appeal

did not apply *Miranda* unreasonably in its decision and that the decision was not based on an unreasonable determination of facts in state court proceedings. We affirm.

## Underlying Facts and Trial

On January 12, 2002, John McMillian picked up his friend Marylin West from her evening shift at a grocery store in the Wilmington area of Los Angeles, with plans to drive her to dinner. West asked McMillian to bring her back to her apartment complex first so she could change out of her work uniform. McMillian obliged. He waited outside the complex in the driver's seat of the car while West went inside.

A short time later, around 9:30 p.m., West walked back outside toward the car. As she walked, a heavy-set Hispanic male in a dark, hooded sweatshirt approached her, riding a black and silver bike. Her walkway was well lighted; West stated at trial that she could see the man's face clearly, and identified Nelson Hernandez in court as the man she saw that night. West also testified that she had seen Hernandez in the apartment complex five to ten times before during the six months prior to that night and had spoken to him briefly on occasion. She testified that as she walked Hernandez began to follow her and asked her name, who the man in the car was, and where they were going.

As the two neared the car, a second, thinner Hispanic male joined them. When the three reached the car, according to West, Hernandez' attention turned to McMillian. West testified that she attempted to open the passenger door, but that Hernandez "had opened" it first, and that he stood

"inside" of the opened door on the passenger side.[1]  The two men began to ask McMillian who he was, where he was from, and if he "gang-banged."[2]  McMillian looked straight ahead and replied that he did not "gang-bang" and did not live around there.  According to West, the two men repeated their interrogation for some five minutes, while she pleaded with them to leave her friend alone.  Meanwhile, a group of about fifteen Hispanic males gathered.  An older man from the group approached and said something like "don't do it."  At that point, according to West, Hernandez pulled the hood of his sweatshirt over his head, produced a gun, and began firing at McMillian.  West ran and hid in some bushes; McMillian died at the scene.  When police arrived, they took West to the station, where she identified Hernandez in two photo "six-packs."  Hernandez, who at first could not be located, was arrested several months later and charged with first-degree murder.

At trial, Hernandez' defense was that he was a hundred miles away that night at a party and that West mistakenly identified him.  As noted, West placed Hernandez at the scene.  Despite West's inability on cross-examination to remember precise details about the murder, including whether Hernandez had piercings or marks, or the makeup of the

---

[1] On cross examination, West repeated that Hernandez opened the passenger door of the car.  This seemingly insignificant detail was the subject of the critical portion of the conversation that Hernandez had with the bailiff shortly after West's testimony.  As discussed below, who opened the door matters not; that Hernandez was there, instead of 100 miles away at a party, matters a great deal.

[2] McMillian was African-American and was in an area controlled by a Hispanic street gang, the "Westside Wilmas."  Police officers testified that Hernandez was a member of the gang; his gang name was "Humpty."

crowd that gathered, she told the jury that there was no "uncertainty in [her] mind" that Hernandez was "the person who shot John McMillian." The jury evidently believed her.[3]

### *Conversation with the Bailiff*

After West's testimony the court took a morning recess. The bailiff, Sheriff's Deputy Donald Moore, escorted Hernandez out of the courtroom and back to a lockup cell. On the way there, Hernandez and Deputy Moore engaged in the conversation that forms the basis of this appeal.

Deputy Moore's version of the conversation was as follows: he led Hernandez to the lockup cell after West's testimony. After passing through the door from the courtroom toward the holding area, he asked Hernandez, "Are you going to testify?" Hernandez replied that he "had an alibi but that his attorney did not want him to use it." Moore said that "that was the end of" that "first conversation." The two were then silent for about "forty-five seconds to a minute" as they proceeded up some stairs to the lockup cell area. When they reached the landing at the top of the stairs, according to Deputy Moore, Hernandez initiated a "second conversation" on a "different topic" from the "topic as before that [we] had been discussing." To "initiate that conversation," Hernandez asked Moore "what [he] thought about [West's] testimony." Deputy Moore told Hernandez "I thought she was nervous and [the defense] attorney tripped her up a little bit." At this, according to Deputy Moore, Hernandez "immediately blurted out that 'the bitch couldn't recall anything. She opened the door, we didn't'—excuse me—'she didn't open the door, we

---

[3] They believed West, despite her impeachment with a criminal record of forgery, providing a false financial statement, and grand theft.

did.'"**4** Although Deputy Moore was at first "overwhelm[ed]" by the statement, and was initially unsure whether Hernandez said that "she" or "we"opened the door, Moore testified he was certain that one of the two statements—either "she" or "we" opened the door—was correct. Upon further reflection, Moore determined that Hernandez said "she didn't open the door; we did." Deputy Moore wrote that version of the statement down. That, stated Moore, was the "entire conversation."**5**

According to Moore, he asked the question "Are you going to testify?" only out of "curiosity," and "just to see" about the "length of the trial," "because the D.A.'s case was moving along pretty fast, and I took the assumption that the case was almost over." Moore also said it was his "preference" to talk to prisoners to let him "understand the defendant and how he's going to react in court" for "security purposes."

In Hernandez' version of the conversation, Moore asked no questions at all before *Hernandez* started talking first.**6**

---

**4** West, as stated above, had testified that Hernandez opened the car door.

**5** Moore admitted that he never gave Hernandez *Miranda* warnings at any point.

**6** When asked at the suppression hearing by his own defense counsel, "Do you think it's accurate that, when you walked behind the east door, [Moore was] the first one that said something to you?," Hernandez said "no." When defense counsel asked "did you say anything to him first?" Hernandez answered "yes." Hernandez testified that he heard Moore at some point say "Are you going to testify?" but repeated that Moore was not the first to speak. On Hernandez' cross-examination, the following exchange took place:

Hernandez said that he started the conversation by asking Moore "How [do you] think my case is looking?" Moore responded, "I seen people walk on worse[] things than this." After the two got up the stairs to lockup, Hernandez, in reference to West, said "I think this girl's lying." Moore replied, "Why is that?" Hernandez answered "because in the police report it says that she stated she opened up the door. And then, of course, she said I opened up the door." Hernandez insisted that he did not say that "we" opened the door, or that "she" did, but was only pointing out that there was a discrepancy between West's testimony and the police report that quoted her.

## Suppression Hearing

After the conversation, Moore informed the court clerk and court reporter what had happened. (A detective, who was in the courtroom as a prosecution witness, also overheard what Moore told them). Moore then spoke to both counsel, and ultimately to the court. The judge relieved Moore from courtroom duty immediately and scheduled a hearing for the next morning, Friday, September 12, at 9:00 a.m., to

---

[Prosecutor]: Sir, it's your testimony that you initiated the conversation with Deputy Moore?

A. Did I start the conversation first?

Q. Yes.

A. Yes.

Q. Deputy Moore did not. That is your testimony, right?

A. Yes.

determine what to do about the unexpected development. Scheduled prosecution testimony continued through the afternoon.

At the Friday morning hearing, the prosecutor said that he would call Moore as a witness. Defense counsel objected to Moore's proffered testimony and moved to exclude it. Defense counsel first argued that the judge could not "fairly judge the credibility" of the bailiff in an evidentiary hearing because of their relationship, and that the judge should recuse himself. Defense counsel also requested a continuance so he could consider whether to file a *Pitchess* motion[7] and so he could investigate what happened in the conversation. The judge stated that a continuance would result in a certain mistrial because the jury was scheduled to sit only for three more days. But the court deferred ruling for the morning, ordered Moore to make a written report about the

---

[7] A *Pitchess* motion asks for "access to records of complaints, or investigations of complaints, or discipline imposed as a result of those investigations" of "law enforcement and custodial personnel." *See Pitchess v. Superior Court*, 555 P.2d 305 (Cal. 1974), *superseded by* Cal. Penal Code §§ 832.7, 832.8, Cal. Evid. Code §§ 1043–1045. The motion must include an affidavit "showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation and stating upon reasonable belief that the governmental agency identified has the records or information from the records." Cal. Evid. Code § 1043(b)(3). The "materiality" prong can be "satisfied by general allegations which establish some cause for discovery," but must be "requested with adequate specificity to preclude the possibility that defendant is engaging in a 'fishing expedition.'" *City of Santa Cruz v. Mun. Court*, 260 Cal. Rptr. 520, 526 (Cal. 1989) (citation omitted). Once good cause is shown, the court then makes an *in camera* examination of the records to see whether they are relevant to the "pending litigation," but with instructions that the court is to take into careful account the "privacy interests" of the officer. Cal. Evid. Code § 1045.

conversation, and scheduled an evidentiary hearing for the afternoon to determine whether Hernandez' *Miranda* rights were violated. Previously scheduled prosecution testimony then continued.

At the afternoon hearing, defense counsel renewed his request for a continuance until the next Monday, citing "potential conflict issues" with himself and people in his office and "potential for my testimony."[8] The court denied the request, reasoning that if it granted a continuance it would "lose this jury" because their decision was scheduled to be rendered by Tuesday afternoon, and the prosecution had not yet closed its case. The judge also refused to recuse himself. Moore then testified about the conversation. Defense counsel asked permission to call the court reporter, the court clerk, and the detective who were present when Moore first reported the conversation.[9] The court denied the requests without

---

[8] Counsel did not mention a *Pitchess* motion as a reason for his renewed request for a continuance. Nor did he explain what the "potential conflict" might be. Further, he made no proffer as to the subject matter of any of his potential testimony.

[9] It was apparently only during the course of Deputy Moore's testimony that defense counsel learned that Moore reported the conversation to the clerk, court reporter, and detective. Defense counsel asked Moore on cross-examination which people he told "about the statement" "She didn't open the door, we did." Moore said he told the clerk, and that the court reporter and detective were present. Defense counsel, however, did not ask Moore what exactly he told the clerk, other than that Moore told her "about the statement." Counsel did not request a recess to interview the potential witnesses. Further, counsel made no proffer of proof that he intended to adduce from these persons. Counsel evidently did not know what the witnesses might say; he asked to call the reporter because "I'd like to hear what she has to say." The court denied the request.

explanation.  Hernandez then testified to his version of the conversation.

### Trial Court Ruling: No Miranda Interrogation

The court then heard counsels' argument on the motion to suppress Deputy Moore's testimony.  Defense counsel stated that he wanted the court to exclude Moore's testimony "notwithstanding the fact that both my client and the deputy have essentially testified that it was a consensual, non-interrogation style encounter" because "the circumstances and the unusual relationship that exist between a jailer and a person in custody are inherently—create a situation that is inherently similar to an interrogation."  The prosecutor responded that "there was clearly no *Miranda* violation as there was no interrogation as required by the custodial interrogation aspects of *Miranda*."  The court agreed with the prosecutor:

> I'm satisfied there's no *Miranda* violations.
> There was no interrogation.  There was one
> question according to the bailiff—but I don't
> think it had anything to do with this statement,
> nor did it have anything really to do with this
> case except for scheduling, and so I find no
> *Miranda* violation.

The court also stated "I don't think it's my role here to determine which interpretation should be given to the words that were spoken or even make a determination as to what words were spoken.  That's a jury function."

The judge accordingly permitted Deputy Moore to testify to the jury, with the instruction directly after Moore's

testimony that the jury was not to give Moore's testimony any extra weight because he was the court's bailiff. Moore admitted to the jury that there were "two possibilities" of who Hernandez said opened the car door, but settled on "she didn't open the door. We did." After Moore's testimony, which obviously placed Hernandez at the scene no matter who he said opened the car door, and thus bolstered West's identification of Hernandez, the state rested. Hernandez did not take the stand in his case-in-chief, wherein two alibi witnesses—including his mother—said he was at a party in another city that night. The jury convicted.

*Post-conviction Proceedings*

On direct appeal, the California Court of Appeal affirmed the conviction and held, in a reasoned decision, that there had been no *Miranda* interrogation because "the bailiff's neutral question was not the functional equivalent of interrogation because it was not the type of question likely to elicit an incriminating response." The California Supreme Court denied review without opinion.

After Hernandez' state habeas petitions were denied, Hernandez filed a *pro se* 28 U.S.C. § 2254 federal habeas petition, in part on the ground that the trial court erred in allowing Moore to testify. The district court denied the petition because, under AEDPA, there had been no unreasonable application of federal precedent or unreasonable finding of fact in permitting Moore's testimony. We granted Hernandez a certificate of appealability on the following issue: "whether appellant's rights, under *Miranda v. Arizona*, 384 U.S. 436 (1966), were violated by the trial court's admission of the court bailiff's testimony." We now affirm.

## Standard of Review

AEDPA bars the relitigation in federal court of any habeas claim that was "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). There are two narrow exceptions: a petitioner may bring an adjudicated habeas claim if 1) the state court's adjudication of the claim has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or 2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* A federal court must analyze the "last reasoned decision" of the state court—here, the California Court of Appeal opinion that rejected Hernandez' state direct appeal. *Ylst v. Nunnemaker*, 501 U.S. 797, 804–06 (1991); *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008). We review de novo a district court's decision to deny a state convict's federal habeas petition. *Bribiesca v. Galaza*, 215 F.3d 1015, 1018 (9th Cir. 2000).

## Discussion

Under AEDPA, Hernandez must show either 1) that the California Court of Appeal's decision on direct appeal was an unreasonable application of federal law, as "clearly established" by Supreme Court precedent, or 2) that its decision rested on an underlying unreasonable determination of fact. Hernandez argues that both statutory grounds are met. First, he asserts that the California Court of Appeal's application of *Miranda* and of *Rhode Island v. Innis*, 446 U.S. 291 (1980) to find that the conversation with the bailiff was not an "interrogation" was objectively unreasonable. Second,

he argues that the trial court's fact-finding process in allowing Moore to testify was so defective—an un-recused judge, denial of continuance, refusal to hear the clerk, reporter, and detective—that the Court of Appeal's decision rested on an unreasonable determination of fact. Third, Hernandez argues that those procedural deficiencies were so egregious as to be *themselves* an objectively unreasonable application of federal law. The Warden has made our task more difficult by briefing only Hernandez' first contention: that Deputy Moore improperly interrogated him to produce the incriminatory admission. We accordingly attend to that contention first, then turn to the other two arguments and discuss the result of the Warden's failure to brief those issues.

## I.   The California Court of Appeal did not unreasonably apply *Miranda* or its Supreme Court progeny.

For a "federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). Instead, the application must have been "'objectively unreasonable.'" *Id.* AEDPA thus precludes a federal court from granting habeas relief if "fairminded jurists could disagree" whether the state court incorrectly applied federal Supreme Court precedent. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

The precedents at issue here are *Miranda* and its Supreme Court progeny. They forbid a prosecutor from using statements "stemming from custodial interrogation of the defendant unless [he] demonstrates the use of procedural safeguards" such as the familiar *Miranda* warnings: that the accused has the right to remain silent, to consult with an attorney, and to have his counsel present with him during

questioning. 384 U.S. at 444. The parties here do not dispute that Hernandez was in "custody" for *Miranda* purposes or that Deputy Moore never gave Hernandez *Miranda* warnings. Instead, the question is whether the California Court of Appeal was "objectively unreasonable" when it found that the conversation between the two did not amount to an "interrogation" under federal Supreme Court precedent.

The Supreme Court has instructed that an "interrogation" is "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 300–01 (1980) (footnote omitted).[10]   Nevertheless, "'[v]olunteered statements of any kind are not barred by the Fifth Amendment.'" *Id.* at 300, quoting *Miranda*, 384 U.S. at 478); *see also United States v. Sherwood*, 98 F.3d 402, 409 (9th Cir. 1996) ("'Spontaneous' or 'volunteered' confessions of a suspect in custody are admissible despite the absence of a prior *Miranda* warning.").

As the district court noted below, Hernandez initiated a second conversation by asking Moore a question after the two

---

[10] In *Innis*, two officers arrested a robbery suspect and put him in the back seat of the patrol car. As they drove to the police station, the officers engaged in a conversation within Innis' hearing about the missing weapon, which the officers stated was being searched for in an area near a school for handicapped children. One officer expressed to the other his concern that a child could be hurt by the missing firearm. At this, Innis "interrupted the conversation, stating that the officers should turn the car around so he could show them where the gun was located." 446 U.S. at 295. The Supreme Court held that the officers' conversation did not amount to "interrogation" because the officers had no reason to know that their "conversation was reasonably likely to elicit an incriminating response from" Innis. *Id.* at 302.

walked up the stairs and were on a different topic. *Hernandez v. Hedgpeth*, CV-07-7036-DSF-AGR, 2011 WL 488402 at \*8 (C.D. Cal. 2011) *report and recommendation adopted*, CV 07-7036-DSF AGR, 2011 WL 503530 (C.D. Cal. Feb. 7, 2011), *citing Miranda*, 384 U.S. at 478.

Assuming that Deputy Moore's version of events is correct,[11] there was a gap of some forty-five seconds to a minute between Moore's question "Are you going to testify?" and Hernandez' question "What did you think of [West's] testimony?" To be sure, it would be reasonable to conclude that the walk up the stairs was only a pause in an extended discussion that Deputy Moore—and not Hernandez, again assuming Hernandez' version is wrong—started about the case. But it is also reasonable to see *two* conversations, the second initiated by Hernandez, followed by Hernandez' "spontaneous" and "volunteered" "blurt[ing] out" that West "couldn't remember anything." It is particularly reasonable to see two conversations because Hernandez changed topics after the walk up the stairs: from himself and his own un-used alibi to West and her veracity. In light of Supreme Court precedent about volunteered or spontaneous statements, the California Court of Appeal was not thus "unreasonable" in its determination that there was no "interrogation" and that Hernandez' inculpatory diatribe as to West was volunteered.

More important, we cannot say that the California Court of Appeal was unreasonable when it found that Moore's question was not itself an "interrogation." The Court of Appeal specifically applied *Innis* to Hernandez' facts, and

---

[11] If Hernandez' own version of events is correct, Moore said nothing until Hernandez spontaneously initiated the entire conversation. Hernandez chose not to testify to his version before the jury.

found that Deputy Moore's question "Are you going to testify?" was a "neutral question which called only for an equally neutral answer. [Hernandez], for example, could have answered 'Yes,' 'No' or 'Maybe.'" *People v. Hernandez*, B170634, 2004 WL 2428700 at *8–9 (Cal. Ct. App. 2004) (unpublished).

Of course, no matter Moore's claim that his reason for asking the question was merely to check the timing of the trial, *Innis* demands that we ask whether Moore "should have known" that his question "Are you going to testify?"[12] was "reasonably likely to evoke an incriminating response." *Innis*, 446 U.S. at 301. To be sure, it would not be unreasonable to take Moore's question as prying for information about the crime, the equivalent of "She says you're guilty—what's your side of the story?" Such a question, so construed, might be reasonably likely to provoke an incriminating response.

However, we think that it would *also* be reasonable to conclude that the question was "neutral," a request simply to know whether Hernandez would take the stand, just as Hernandez clearly took it when he answered that he indeed would not testify. Moreover, it would be reasonable to find that Moore neither could nor should have known that his question would elicit an incriminating statement. Moore was aware, having been the bailiff during opening statements and West's cross-examination, that Hernandez' entire trial strategy was to claim mistaken identification. It would be reasonable to conclude that Moore could never expect that his simple question would prompt Hernandez to *correct the*

---

[12] Again assuming, contrary to Hernandez' testimony, that Moore, and not Hernandez, initiated the conversation with this question.

*details of West's testimony* as a claimed percipient witness to West's actions at the scene of the crime. The possibility of such a response would be so unlikely as to take any officer completely aback—just as Moore said happened. *See Innis*, 446 U.S. at 302–03 (holding that, "under the circumstances," including the officers' lack of knowledge that Innis might respond with concern for handicapped children, the officers' comments about the murder weapon were not "particularly 'evocative'"). We therefore again cannot say that the California Court of Appeal was unreasonable in its application of clearly established Supreme Court precedent when it determined that Deputy Moore did not "interrogate" Hernandez.

Hernandez suggests four reasons why he nevertheless was interrogated. None is availing. First, Hernandez argues that his youth (nineteen at the time) "made him more susceptible to the coercive pressures of interrogations" when the deputy "confronted" him. He cites *J.D.B. v. North Carolina*, 131 S. Ct. 2394 (2011), for the proposition that the Supreme Court has acknowledged that "juveniles do not have the mental, physical, and emotional ability to deal with the coercive pressures of interrogations as well as adults can." But *J.D.B.* was about whether "the *Miranda custody* analysis includes consideration of a juvenile suspect's age." *J.D.B.*, 131 S. Ct. at 2401 (emphasis added). A *Miranda* custody analysis—whether Hernandez would have felt "free to leave," *id.* at 2399—is not in question here. Instead, the question here is whether Hernandez was being interrogated at all; Hernandez has given no reason why his youth affected Moore's knowledge that his question had any possibility of leading Hernandez to talk about who opened the car door, and who was there to observe the event. *See Innis*, 446 U.S. at 302 ("There is nothing in the record to suggest that the

officers were aware that the respondent was peculiarly susceptible to an appeal to his conscience . . . ."). It was therefore again not objectively unreasonable for the California Court of Appeal to see the question as neutral, even if it considered Hernandez' youth.

Second, Hernandez argues that the "timing of the encounter" turned the conversation into an interrogation because he had just been "confronted" with a witness who accused him of murder. Hernandez argues that he was being "forced to answer a law enforcement officer's question" during the "heat of trial," meaning, presumably, that the question was in effect a cross-examination. But neither version of the conversation reveals anything resembling coercion. And even if Hernandez' view is reasonable, it does not make the alternate view that the question was "neutral" unreasonable beyond the agreement of fairminded jurists. And again, all that assumes that Moore's version of the conversation—and not Hernandez' own—is accurate. If Hernandez' version is accurate, Hernandez initiated whatever conversation took place, and *his* question could not reasonably be interpreted as a request that he be interrogated.

Third, Hernandez argues that the "physical setting" turned the encounter into an interrogation: "isolated, handcuffed, and alone, he was confronted by a presumably armed deputy sheriff" and by the "evidence against him." But the defendant in *Innis*, for example, was found not to have been interrogated even though he was confined in the back seat of a police car and was "confronted" by two armed officers who were driving him to a police station while talking about the murder weapon. 446 U.S. at 294–95. And it bears repeating that Hernandez' own testimony was that *he* pressed the issue on Deputy Moore.

Fourth, Hernandez argues that "[a]ny defendant could reasonably interpret [Moore's] question . . . as an inquiry to see what they thought of the evidence the prosecutor had just introduced at trial" and thus was a question that was reasonably likely to elicit an incriminatory response. We have already largely addressed this point. There is nothing unreasonable in construing Deputy Moore's question exactly as Hernandez wishes. But neither would a court be *objectively unreasonable* in construing it as a neutral question, with an unreasonably low probability of evoking the response, in effect, "That's not how it was; I was there."**[13]**

In sum, while we might have found differently had we been the trial judge or the California Court of Appeal, the Court of Appeal was not "objectively unreasonable" when it found no *Miranda* interrogation. The district court was accordingly correct that it could not grant relief under AEDPA on this theory. We turn to Hernandez' other theories of relief, but pause first to discuss a disturbing error on this appeal by the Warden.

---

**[13]** Hernandez' supplemental citation to *U.S. v. Hunter*, 708 F.3d 938 (7th Cir. 2013), only makes the Warden's point. In *Hunter*, the suspect was in the hospital after being shot by police while fleeing a felony, and asked an officer to call his mother, father, and a lawyer. The officer asked "What do you want me to tell these people?," which prompted an incriminating response. The Seventh Circuit held that the question was an interrogation and an "invitation to disaster," and rhetorically asked "what answer could [Hunter] give . . . that would not be incriminatory?" *Id.* at 947–48. The answer to the same rhetorical question in Hernandez' case, however, could be just what the California Court of Appeal reasonably said: when Moore asked "Are you going to testify?," Hernandez could have answered "Yes," "No," or "Maybe"—and then initiated nothing further—or answer as he did: "I have an alibi but my attorney doesn't want me to use it." None of these responsive answers would have placed him at the crime scene when McMillian was shot to death.

## II. Respondent's failure to brief and AEDPA

Hernandez briefed fully his three theories of relief: unreasonable application of *Miranda*, deficient fact-finding at the trial court level, and unreasonable application of federal law because of that deficient fact-finding. The Warden, however, briefed a response only to the first theory and ignored the other two theories entirely. Hernandez in his reply brief pointed out that silence and argued that the Warden waived the two unanswered issues, that AEDPA accordingly did not apply to bar relief, and thus that he was entitled to a review of the *Miranda* issue de novo and without AEDPA's "objectively unreasonable" standard of review.[14] At oral argument, the panel questioned Respondent's attorney about her failure to brief. Counsel repeatedly apologized, but offered no reason why the oversight happened.

This court then ordered supplemental briefing on the following questions: "1) Can the State waive the argument that the [AEDPA] standard of review applies; and 2) If so, should the court exercise its discretion to treat the State's failure to brief this issue as a waiver and thus review the merits of Appellant's claims de novo?" The parties filed letter briefs. After review, we conclude that—despite the Warden's counsel's unexplained and unexcused error—did not waive AEDPA's standard of review, nor did the failure to brief constitute concession or waiver of the legal issues at stake.

---

[14] *See Maxwell v. Roe*, 628 F.3d 486, 494–95 (9th Cir. 2010) ("[W]hen a state court adjudication is based on an antecedent unreasonable determination of fact, we proceed to consider the petitioner's related claim de novo.").

a.  There has been no waiver of AEDPA's standard of
    review.

The week before this panel heard oral argument in this
case, the Ninth Circuit handed down an opinion in another
AEDPA case, *Amado v. Gonzalez*, 734 F.3d 936 (9th Cir.
Oct. 30, 2013). Neither party in that case addressed the
proper standard of review in its briefs, but we held that we
had "the obligation to apply the correct standard, for the
[AEDPA standard] is non-waivable." *Id.* at 946; *see also Eze
v. Senkowski*, 321 F.3d 110, 121 (2d Cir. 2003) ("AEDPA's
standard of review . . . is not a procedural defense, but a
standard of general applicability for all petitions filed by state
prisoners after the statute's effective date presenting claims
that have been adjudicated on the merits by a state court.").
Thus, as both parties agreed in their letter briefs, the AEDPA
standard of review itself cannot be waived.

b.  The panel will address Hernandez' theories.

Hernandez nevertheless urges in his letter brief that we
hold that the Warden has waived any *argument* that the trial
court's decision did not rest on an unreasonable determination
of the facts, or that the Warden by silence has *conceded* that
the trial court's decision rested on unreasonable
determination of the facts or unreasonable application of law
under 28 U.S.C. § 2254(d). Accordingly, Hernandez again
asks us to review the state court adjudication of the *Miranda*
question de novo, without AEPDA's standard of review.

But even if the Warden by silence conceded that AEDPA
does not bar issuance of the writ, such concession cannot bind
us. *See United States v. Miller*, 822 F.2d 828, 832 (9th Cir.
1987) (holding that appeals panel cannot be "bound by the

government's 'erroneous view of the law'") (citations omitted).**[15]** We will evaluate for ourselves AEDPA's directives to determine whether we must view the sole issue posed by the Certificate of Appealability—whether Hernandez' *Miranda* rights were violated by the admission of Moore's testimony—through AEDPA's deferential lens.**[16]**

---

**[15]** *See also Leslie v. Attorney Gen. of U.S.*, 611 F.3d 171, 174 n.2 (3d Cir. 2010) (chastising government for arguing in appellee's brief only jurisdiction and not responding to the merits of petitioner's opening brief that argued that his due process rights were violated by deficient notice of a removal hearing, which "fail[ed] to assist the Court in evaluating the specifics of Petitioner's arguments [and] required the Court to conduct a special, searching analysis of Petitioner's contentions," but making "clear that the answering party's dereliction, as here, could not constitute a waiver because, in the final analysis, it is for the Court to evaluate the issues presented by the appellant or petitioner," and construing the failure to argue as a failure to brief, the remedy for which under Fed. R. App. P. 31(c) was waiver of oral argument on the issue).

**[16]** But we should not have to do so without the assistance of one of the parties. We, like the *Leslie* court, express our displeasure with the Warden's lawyers in this case. As the Supreme Court has cogently explained, we "rely on the parties to frame the issues for decision and to assign to courts the role of neutral arbiter of matters the parties present . . . . [A]s a general rule, '[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.'" *Greenlaw v. United States*, 554 U.S. 237, 243–44 (2008) (internal quotation marks omitted).

**III.    There was no "unreasonable determination of the facts."**

   a.  Standards of review

A state court's decision is based on unreasonable determination of the facts under §2254(d)(2) if the state court's findings are "unsupported by sufficient evidence," if the "process employed by the state court is defective," or "if no finding was made by the state court at all."  *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).  While "not impossible to meet," that is a "daunting standard—one that will be satisfied in relatively few cases," especially because we must be "particularly deferential to our state-court colleagues."  *Id.* at 1000.  Thus,

> before we can determine that the state-court factfinding process is defective in some material way, or perhaps non-existent, we must more than merely doubt whether the process operated properly.  Rather, we must be satisfied that *any appellate court* to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.

*Id*. (emphasis added).  That is because § 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (citation omitted).

b.  Hernandez' claims.

Hernandez argues that the suppression hearing on Deputy Moore's testimony was defective and inadequate for three reasons: 1) the trial court held the admissibility hearing on Moore's testimony in an "unreasonably short time frame" and should have granted a continuance, 2) the judge did not recuse himself before the hearing even though he had worked with Moore for two years, and 3) the judge did not allow "necessary and appropriate" witnesses—the clerk, reporter, and detective to whom Moore reported the conversation with Hernandez—to testify.  Additionally, Hernandez argues that the fact-finding process was so defective for those three reasons that the trial court (and Court of Appeal) unreasonably applied clearly established federal precedent that requires "minimum procedures" for the "ascertainment of the truth" that provide a "constitutionally adequate opportunity to be heard." *Panetti v. Quarterman*, 551 U.S. 930, 949, 952, 954 (2007) (citation omitted).

Hernandez' pro se petition states that he should be granted relief because "[a]llowing the bailiff to testify" was "prejudicial error for [multiple] reasons as was a denial of continuance or a mistrial."  Hernandez stated on his petition form that he had brought the claim up on direct appeal to the California Court of Appeal.  Hernandez therefore has clearly presented us with the lack of continuance issue.  However, although we construe pro se petitions liberally, *Allen v. Calderon*, 408 F.3d 1150, 1153 (9th Cir. 2005), lack of recusal appears to be an entirely new theory in this appeal.  It was mentioned briefly in the trial court, but was distinctly argued neither in the district court nor in the California Court of Appeal on direct appeal.  We therefore do not address it. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("As

a general rule, we will not consider arguments that are raised for the first time on appeal."); *Picard v. Connor*, 404 U.S. 270, 275 (1971) (holding that a claim is exhausted for federal habeas purposes if it "has been fairly presented to the state courts").

Additionally, it is not clear that the court staff witnesses issue was squarely argued to the district court—there is no mention of it in the court's decision.[17]  (Hernandez did, however, raise it clearly in the California Court of Appeal.) Nevertheless, even if issue is properly preserved, we hold that neither the trial court's denial of a continuance nor its refusal to call the courtroom witnesses constituted an unreasonable determination of the facts.

 c. Failure to grant a continuance did not result in an "unreasonable determination" of fact.

Both the California Court of Appeal and the district court considered the trial judge's failure to grant a continuance to allow the defense to pursue the goals vaguely stated.  They concluded, respectively, that there was no abuse of discretion or unreasonable application of law or unreasonable finding of fact. *People v. Hernandez*, B170634, 2004 WL 2428700, at *10 (Cal. Ct. App. 2004); *Hernandez v. Hedgpeth*, CV-07-7036-DSF-AGR, 2011 WL 488402, at *8–9 (C.D. Cal. 2011).  The district court was correct.  "There are no mechanical tests for deciding when a denial of a continuance

---

[17] *See Arizona v. Components Inc.*, 66 F.3d 213, 217 (9th Cir. 1995) (holding that an "argument must be raised sufficiently for the trial court to rule on it" and that "nowhere in the district court's opinion does the issue . . . appear, which is further indication that [appellant] did not raise the issue with the district court").

is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964); *see also Morris v. Slappy*, 461 U.S. 1, 11–12 (1983) ("[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'" would violate a constitutional right) (quoting *Ungar*, 376 U.S. at 589).

At the first hearing after the court discovered the conversation between Moore and Hernandez, on Friday morning, defense counsel asked for a continuance to get a report from Moore of what happened. The court ordered Moore to provide one. Counsel then suggested that he needed a continuance to make a *Pitchess* motion. But Moore had been a deputy for only three years, and had been the court's bailiff for the past two of those three. Both Moore and the judge made clear that nothing like this had ever happened before. The court therefore reasonably considered that a continuance to go through the process of a *Pitchess* motion would likely reveal nothing and weighed that against the strong likelihood of a mistrial.[18] The decision not to grant the continuance in the face of trial scheduling was therefore not "unreasoning" or "arbitrary." *Morris*, 461 U.S. at 11–12.

---

[18] As it turned out, Hernandez did not contradict Deputy Moore's version of the conversation in any way that would have altered the critical conclusion that Deputy Moore did not interrogate Hernandez. Thus, anything in Moore's file that might have impeached him would not have made a difference to that discrete issue. Whether a history of false accusations of prisoners would have made a difference to Deputy Moore's credibility to the jury about the *content* of Hernandez' statement about the car door is beyond the scope of our Certificate of Appealability.

Counsel also asked for a continuance at the evidentiary hearing itself at noon because he or colleagues in his office might have some "conflicts" he needed to investigate, that there were "serious issues regarding my representation," and that he might even need to testify. But counsel did not state the nature of the "conflict" or the "serious issues," nor did he explain what he would need to testify about. Nor did he request an *ex parte* hearing to give some substance to his conclusory claims. Rather, he then proceeded anyway. We therefore have no basis to consider the court unreasonable on this point.

Finally, counsel asked for a continuance because he had not had time to investigate the facts. But both Deputy Moore and Hernandez were thoroughly examined and cross-examined at the hearing, and, critically, differed on the facts only in two material ways. Deputy Moore candidly stated that he started the entire conversation with "Are you going to testify?"; Hernandez insisted that *he*, Hernandez, started the conversation himself by asking "How do you think my case is looking?" The two also did not agree about the *content* of Hernandez' statement about the car door, but that was not relevant to the issue whether there was an interrogation. Thus, a continuance for investigation over the weekend could have added no relevant facts to the only question before the court at the hearing: was the conversation between the testifying conversants an interrogation within the meaning of *Miranda*? The factfinding process of the trial court was adequate to answer that question. The trial court therefore also did not unreasonably misapply applicable federal due-process precedent by depriving Hernandez of "minimum procedures" for the "ascertainment of the truth" or a "constitutionally adequate opportunity to be heard." *Panetti*, 551 U.S. at 949, 952, 954. We accordingly cannot say on this

issue that the trial court's findings were "unsupported by sufficient evidence," or based on a "defective" process, nor that § 2254(d)'s "daunting" standard has been overcome. *Taylor*, 366 F.3d at 999, 1000.

    d.  Failure to call witnesses.

Under the Due Process Clause of the Fourteenth Amendment, criminal defendants must be afforded a meaningful opportunity to present a complete defense. *California v. Trombetta*, 467 U.S. 479, 485 (1984). The Sixth Amendment, as incorporated by the Fourteenth Amendment, grants an accused the right to call witnesses in his favor. *Rock v. Arkansas*, 483 U.S. 44, 52 (1987).[19]  But it is

> normally within the power of the State to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion, and its decision in this regard is not subject to proscription under the Due Process Clause unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.

*Patterson v. New York*, 432 U.S. 197, 201–02 (1977) (internal quotation marks omitted); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("[W]e have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability even if the defendant would prefer to

---

[19] We note that a California judge can order persons within his presence to testify, without the service of subpoena.  *See* Cal. Evid. Code § 775.

see that evidence admitted."). Furthermore, to make out a constitutional violation, a petitioner must "at least make some plausible showing of how [a witness'] testimony would have been both material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 859 (1982).

Thus, to violate AEDPA, Hernandez would have to make a plausible showing that some disallowed evidence would have aided him and that the trial court in disallowing it misapplied some Supreme Court-decreed "fundamental" "principle of justice," *Patterson*, 432 U.S. at 201–02, or rendered the evidentiary hearing "unsupported by sufficient evidence," or "defective," to the point that "*any appellate court* to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Taylor*, 366 F.3d at 999, 1000 (emphasis added).

At the afternoon hearing, Hernandez wished to call the court reporter, the court clerk, and a detective who was also a trial witness. These three heard Deputy Moore report something about his conversation with Hernandez. Defense counsel attempted to call these witnesses, but the court refused, without explanation. Hernandez argues that the court should not have refused him the right to call these "necessary and appropriate" witnesses. Doing so, Hernandez argues, resulted in his "being deprived of an opportunity to present relevant and perhaps exculpatory evidence." He points out that the witnesses were all present, and asserts that examining them would not have "greatly expanded" the hearing.

The California Court of Appeal inferred, however, that the testimony of the extra witnesses would have been cumulative. A California trial judge has broad discretion to

exclude cumulative evidence. Cal. Evid. Code § 352(a). Moore testified in the hearing and in front of the jury to both versions of Hernandez' statement—"she" or "we" opened the car door—and admitted that at first he could not remember which was accurate. Thus, the California Court of Appeal reasoned, no matter which version of Hernandez' statement the bailiff reported to the court staff witnesses, all versions placed Hernandez at the scene of the crime, and not 100 miles away.

Given the great importance of Deputy Moore's testimony, of course, the court would have been reasonable to allow the witnesses. But a reasonable appellate court could also find, as the Court of Appeal did, that their testimony would have been cumulative under well-settled rules of evidence and thus not necessary to the court's factfinding on *Miranda*. Hernandez heard Moore testify and was asked at the suppression hearing whether Moore's testimony was accurate. Given this chance, Hernandez corrected *only* the points that he, Hernandez, spoke first, and then disputed precisely what he had said about the car door. Once Hernandez testified essentially to the same facts as Moore as to the discrete *Miranda* question, there would be little the three witnesses could likely add except to repeat the same story that Moore told them.[20] Defense counsel also did not

---

[20] It is true that the court denied defense counsel's request for the witnesses right before or during Hernandez' testimony at the hearing. (The detective walked into the courtroom a few seconds into Hernandez' direct examination.) But had Hernandez vehemently disputed Moore's testimony on any point material to whether there was an interrogation, defense counsel would have been on firm ground to renew his requests. Instead, counsel admitted that both Hernandez and Deputy Moore "have essentially testified that it was a consensual, non-interrogation style encounter"—even if counsel then immediately argued that the "jailer"

ask for a recess to interview the three witnesses to find out what Deputy Moore might have said to them so that he could proffer what the witnesses might say and why it would be useful.[21]   For that matter, defense counsel did not press Deputy Moore on cross-examination about the details of what, precisely, he reported to the witnesses.  Instead, counsel asked Deputy Moore *only* when and to whom he spoke "about the statement," but did not search for inconsistencies in the content of what Moore told the witnesses.

Thus, we cannot say the court's handling of the hearing was so "defective" or unreasonably "unsupported" by sufficient evidence on the *Miranda* question that *no* appeals court could support it.  Nor has Hernandez shown that the hearing violated any "fundamental" principle of justice or deprived him of a "meaningful opportunity" to present a complete defense on that question.[22]  Therefore, the trial court

---

relationship in and of itself rendered the conversation "inherently similar to an interrogation."  That argument stemmed from the obvious fact of Hernandez' custody, not any testimony at the hearing.

[21] We note that at no point—direct appeal, state habeas, or district court habeas—has Hernandez proffered any evidence of what the three witnesses would have testified had they been called.  Hence, Hernandez has shown no prejudice to the extent he claims a violation of his Sixth Amendment right to call witnesses in his favor. *See Valenzuela-Bernal*, 458 U.S. at 867 (holding that, while a criminal defendant cannot be deprived of his right to call witnesses in his favor "arbitrarily," the defendant "must at least make some plausible showing of how [the proposed witness'] testimony would have been both material and favorable to his defense").

[22] Again, to the extent that the witnesses might have clarified to the jury anything relevant about the *content* of what Moore said that Hernandez

was not unreasonable in its factfinding, nor did the trial court (or the California Court of Appeal) unreasonably apply clearly established Supreme Court precedent.  While the trial court's decisions could be second-guessed, they were not an "extreme malfunction[]" for which habeas should be a "substitute for ordinary error correction through appeal." *Harrington*, 131 S. Ct. at 786 (internal quotation marks omitted).  (Indeed, the California Court of Appeal found no abuse of discretion on this point.)   Nor, finally, has Hernandez raised a plausible inference of prejudice.  As a result, AEDPA's deferential standard applies, and bars the relief that Hernandez seeks.

## Conclusion

The California Court of Appeal was not unreasonable in its application of *Miranda* and did not base its decision on unreasonable factual determinations.  Despite the Warden's failure to brief the issue, AEDPA's deferential standard of review still applies.  Accordingly, we **AFFIRM** the district court's denial of habeas relief per 28 U.S.C. § 2254(d).

said about the car door, that is beyond the scope of our Certificate of Appealability.