Dissent by Judge FISHER
OPINION
O’SCANNLAIN, Circuit Judge:
We must decide whether a state appellate court’s affirmance of a conviction for second degree murder, along with its denial of a request for an evidentiary hearing and for a continuance, were contrary to, or involved an unreasonable application of, clearly established federal constitutional law.
I
A
Enrique Godoy and several friends were standing on the balcony of his apartment in Los Angeles when Chasen Pacheco, an acquaintance of Godoy, appeared below. Pacheco had been a friend until a recent dispute over marijuana, and asked Godoy “to come downstairs so he could talk to him.” There, Godoy and Pacheco started wrestling on the grass and throwing punches at each other.
- Godoy’s friends soon broke up the fight, and one friend, Brett Voegeli,. grabbed Go-doy and pulled him up the stairs. Pacheco continued to talk to Godoy, imploring him to go back down “to finish the fight.” Eventually, Godoy’s friend Rodolfo Hernandez, standing nearby, heard Godoy say, “Let me finish him off.”
When Pacheco reached the top of the stairs, Voegeli tried to intervene, but Pacheco pulled him out of the way and said to Godoy, “Let’s finish this.” Pacheco had nothing in his hands and did not try to hit Godoy, and instead, asked “What’s up?” Godoy then stabbed Pacheco three times in the chest and stomach and punched him *1082 in the face. Godoy said, “That’s what’s up” and, “Get the fuck out of here.” Pacheco later died from the stab wounds.
B
In due course, a Los Angeles County Superior Court jury convicted Godoy of second degree murder. An initial sentencing hearing took place on April 27, 2006, whereupon Godoy’s counsel requested a forty-day continuance to prepare a motion for a new trial. The trial court granted the continuance, and set a new hearing date for June 12th. The court also instructed defense counsel to serve the prosecutor with his motion by May 30th.
One week after the due date, Godoy’s counsel filed his motion for a new trial and served it to the prosecutor. In that motion, he asserted among other complaints that one of the active jurors in Godoy’s trial, labeled Juror 10, committed misconduct by “conferring] with a person referred to as a Judge up North.” In a subsequent response to the prosecutor’s motion opposing a new trial, Godoy’s counsel stated that he would “present live witness testimony or declarations from jury panel [sic] at the time of hearing.” On June 8th, the prosecutor requested discovery on any witnesses the defense planned on calling at the upcoming hearing. Godoy’s counsel stated that he would fax the names of such witnesses that day, but failed to do so.
At the June 12th hearing, Godoy’s counsel claimed that two alternate jurors told him that “there was a juror who was text messaging and speaking with a judge up north” during trial. He stated that one of these jurors, an alternate referred to in the record as E.M., was present and ready to testify. The prosecutor asked for a continuance, pointing out that Godoy’s counsel had not disclosed the names and expected testimony of potential witnesses as promised and as California law requires. The court ruled that the prosecutor was entitled to discovery of witness statements the defense would offer, and therefore continued the hearing again to June 29th.
On June 22, Godoy’s counsel sent the prosecutor a declaration from a second alternate juror, referred to as N.L. This declaration stated that during trial, Juror 10 exchanged text messages with her “judge friend.” The declaration stated that “[w]hen the jury was not sure what was going on or what procedurally would happen next, juror number ten would communicate with her friend and disclose to the jury what he said.” In response to these allegations, the prosecutor filed a second supplemental response to Godoy’s motion for a new trial. She asserted that N.L.’s statements demonstrated that the communications between Juror 10 and her “judge friend” concerned only procedural matters rather than matters relevant to the jury’s deliberation or the verdict.
On June 28th, one day before the scheduled hearing, Godoy’s counsel filed a motion requesting an additional thirty-day continuance. He stated that he required this additional continuance because he was “engaged in trial” in another murder case, and because the prosecutor filed her second response to Godoy’s motion — the response to defense counsel’s surprise arguments at the previous hearing — while he was in trial. The state opposed the motion, arguing that Godoy’s counsel had adequate time to prepare.
At the hearing the next day, the court denied defense counsel’s motion to continue the hearing for a third time, finding that “there [was] no legal cause stated.” During this exchange, the court repeatedly asked Godoy’s counsel whether he had more affidavits or evidence relevant to the juror misconduct issue that he would like to present. Counsel stated he was “not prepared” because he had been busy with the other trial. Having considered N.L.’s *1083 affidavit along with arguments previously offered by Godoy’s counsel and the prosecution, the trial judge then denied Godoy’s motion for a new trial.
C
Godoy appealed his conviction to the California Court of Appeal, arguing that the trial court erred in denying the motion for a new trial on the basis of juror misconduct. While his direct appeal was pending, Godoy also filed a petition for writ of habeas corpus in the same court. As part of his habeas petition, Godoy included an additional declaration from E.M. — the alternate juror Godoy’s lawyer brought unannounced to the first hearing — as well as supporting declarations from Godoy’s trial counsel and appellate counsel. E.M.’s declaration elaborated on Juror 10’s alleged misconduct with her “judge friend” up north. According to E.M., Juror 10 texted her judge friend to ask what would happen after the trial judge informed the jury that he had to leave for a medical procedure. E.M. also asserted that Juror 10 received advice from her “judge friend” to write the trial judge a note in an attempt to be excused from jury duty.
On March 18, 2009, the California Court of Appeal took judicial notice of the record submitted with Godoy’s direct appeal and denied Godoy’s request to consolidate his habeas petition and his direct appeal. The Court of Appeal then denied his habeas petition on the merits, concluding that Go-doy had “fail[ed] to state a prima facie case for relief.” That same day, on direct appeal, the Court of Appeal affirmed Go-doy’s conviction in an unpublished opinion. Godoy filed petitions for review of both decisions in the California Supreme Court, which were summarily denied on July 8, 2009.[1]
D
On October 21, 2010, Godoy filed his federal habeas petition. After accepting findings and recommendation of the magistrate judge, the district court denied the petition on May 15, 2013. The district court also denied Godoy a certificate of appeala-bility.
Godoy filed a timely notice of appeal, and we granted Godoy’s request for a certificate of appealability for the issues raised in this appeal.
II
A
We review de novo a district court’s denial of a § 2254 habeas corpus petition. Lopez v. Thompson, 202 F.3d 1110, 1116 (9th Cir. 2000) (en banc). Because Godoy filed his petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act (“AEDPA”) governs review of his claims. Estrella v. Ollison, 668 F.3d 593, 597 (9th Cir. 2011). Under AEDPA, when a state court has adjudicated a claim on the merits, a district court may not grant a habeas petition unless the state court’s adjudication of the claim:
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
28 U.S.C. § 2254(d).
A decision is “contrary to” Supreme Court precedent where “the state *1084 court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently .than [the Supreme] Court has on a set of materially indistinguishable facts.” Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court unreasonably applies clearly established federal law if it “identifies the correct governing legal rule ... but unreasonably applies it to the facts of the particular state prisoner’s case.” White v. Woodall, — U.S. -, 134 S.Ct. 1697, 1705, 188 L.Ed.2d 698 (2014) (quoting Williams, 529 U.S. at 407-08,120 S.Ct. 1495). “[A]n unreasonable application of federal law is different from an incorrect application of federal law.” Williams, 529 U.S. at 410, 120 S.Ct. 1495. Likewise, a state court’s refusal to extend Supreme Court precedent is not an unreasonable application of that precedent. See White, 134 S.Ct. at 1706. Ultimately, “[a] state court’s determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court’s decision.” Harrington v. Richter, 562 U.S. 86, 101, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (internal quotation marks omitted). “If this standard is difficult to meet, that is because it was meant to be.” Id. at 102, 131 S.Ct. 770.
Under § 2254(d)(2)’s factual determination prong, “a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding.” Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). A state court unreasonably determines the facts where the “ ‘process employed by the state court is defective,’ or ‘if no finding was made by the state court at all.’ ” Hernandez v. Holland, 750 F.3d 843, 857 (9th Cir. 2014) (quoting Taylor v. Maddox, 366 F.3d 992, 999 (9th Cir. 2004)). Under this prong, the question is “ ‘not whether a federal court believes the state court’s determination was incorrect but whether that determination was unreasonable — a substantially higher threshold.’ ” Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012) (quoting Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007)). This is “ ‘a daunting standard-one that will be satisfied in relatively few cases.’ ” Hernandez, 750 F.3d at 857 (quoting Taylor, 366 F.3d at 999).
B
When assessing a state court’s determination, “we look ‘to the last reasoned decision’ that finally resolves the claim at issue.” Amado v. Gonzalez, 758 F.3d 1119, 1130 (9th Cir. 2014) (quoting Ylst v. Nunnemaker, 501 U.S. 797, 804, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)). Godoy does not attempt to pinpoint which state court decision serves as the basis for his habeas claim. Instead, he levels arguments at both the California Court of Appeal’s opinion on direct review as well as its one-sentence denial of his habeas petition. Because the California Supreme Court summarily denied review of both decisions, we must “look through” these summary denials to uncover the last reasoned decision on the merits. See McCormick v. Adams, 621 F.3d 970, 976 (9th Cir. 2010); Gill v. Ayers, 342 F.3d 911, 917 n.5 (9th Cir. 2003).
It is difficult if not impossible to determine which California Court of Appeal decision is the last reasoned decision in this case, since the Court of Appeal affirmed Godoy’s conviction and denied his habeas petition on the same day. That said, we doubt the denial of Godoy’s habeas petition can properly be considered a reasoned decision, since it states only that Godoy had “fail[ed] to state a prima facie case for relief.” See Cullen v. Pinholster, 563 U.S. *1085 170, 131 S.Ct. 1388, 1402 n.12, 179 L.Ed.2d 557 (2011) (equating a state court’s determination that “the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief’ with a summary denial on the merits (quoting In re Clark, 5 Cal.4th 750, 770, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993))). Thus, we ask whether the Court of Appeal’s decision affirming Godoy’s conviction on direct review was so egregious that it transgressed AEDPA’s demanding standards.
Ill
Under the Sixth and Fourteenth Amendments, a criminal defendant has the right to be tried by an impartial jury. See U.S. Const, amend. VI; Turner v. Louisiana, 379 U.S. 466, 472-73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) (applying the Sixth Amendment right to the States via the Fourteenth Amendment). Consistent with that guarantee, the Supreme Court has applied a presumption of prejudice to certain kinds of juror misconduct, but has also stated that such presumption may be rebutted where the government demonstrates that the illicit contact with the juror was harmless. See Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954); Mattox v. United States, 146 U.S. 140, 150, 13 S.Ct. 50, 36 L.Ed. 917 (1892). An overlapping line of Supreme Court precedent has indicated that due process also requires “a trial judge [to be] ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.” Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); see also Remmer, 347 U.S. at 229-30, 74 S.Ct. 450. This appeal requires us to interpret these precedents in order to determine: (1) whether the California Court of Appeal unreasonably applied clearly established federal law by concluding that the government had rebutted a presumption of prejudice; and (2) whether the California Court of Appeal acted contrary to or unreasonably applied clearly established federal law in determining that the trial judge was not required to conduct an additional hearing.
A
Godoy first argues that he is entitled to a presumption of prejudice under Rem-mer, Mattox, and Turner, and that the California Court of Appeal unreasonably applied clearly established federal law by failing to place the burden on the government.
1
The Supreme Court’s first and rather oblique statement concerning a presumption of prejudice triggered by egregious juror misconduct occurred more than a century ago. In Mattox, a defendant presented juror affidavits stating that a bailiff told the jury that the defendant on trial for murder had already killed two other people and that the jury had read a newspaper article asserting that the evidence against the defendant was so strong that he would be a “lucky man” if found innocent. 146 U.S. at 143, 13 S.Ct. 50. The Court held the trial court erred in refusing to consider these allegations and reversed the defendant’s conviction, stating that “[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict unless their harmlessness is made to appear.” Id. at 150,13 S.Ct. 50.
Some fifty years later, the Court refined the Mattox rule when considering a similar instance of juror misconduct in Remmer. There, an individual later found to be a friend of the accused told the jury foreman that he “could profit by bringing in a verdict” favorable to the defendant. 347 U.S. at 228-29, 74 S.Ct. 450; Remmer v. United States, 350 U.S. 377, 380, 76 S.Ct. *1086 425, 100 L.Ed. 435 (1956) (Remmer II). The jury foreman reported the incident to the trial judge, who in turn requested an investigation by the FBI. Remmer, 347 U.S. at 228, 74 S.Ct. 450. The FBI questioned the juror about the incident but shared its report only with the judge and the prosecutor, who concluded that the communication was likely made in jest. Id. When the defendant learned of the communication and the subsequent investigation, his counsel brought a motion for a new trial which the trial court denied without a hearing. Citing Mattox, the Supreme Court remanded for a hearing and observed that “[i]n a criminal case, any private communication ... with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial,” but that such presumption may be rebutted where “the Government ... establishes], after notice to and hearing of the defendant, that such contact with the juror was harmless.” Id. at 229, 74 S.Ct. 450 (citing Mattox, 146 U.S. at 148-50, 13 S.Ct. 50). Following the required hearing at the district court and a subsequent petition for certiorari, the Supreme Court again considered the case and concluded that the government failed to carry its burden in demonstrating that the bribery offer did not affect the juror’s “freedom of action as a juror.” Remmer II, 350 U.S. at 381, 76 S.Ct. 425.[2]
In Turner, the Supreme Court held that a defendant’s constitutional rights had been violated when the key witnesses in a murder prosecution — two local sheriffs— were also charged with providing for the jury’s daily needs including transportation, meals, and lodging. 379 U.S. at 468-69, 85 S.Ct. 546. The Supreme Court held that kind of “continuous and intimate association” triggered a presumption of prejudice because of the “extreme prejudice inherent in th[e] continual association between the jurors and ... key witnesses for the prosecution.” Id. at 473, 85 S.Ct. 546.
Reading these cases at face value, we are skeptical that any of them clearly establish that the allegations contained in N.L.’s declaration entitled Godoy to a presumption of prejudice under clearly established federal law. Remmer presumed prejudice where the underlying conduct involved a credible allegation of outright jury tampering. See United States v. Dutkel, 192 F.3d 893, 894-95 (9th Cir. 1999) (distinguishing jury tampering from “more prosaic kinds of jury misconduct” and concluding that “the Supreme Court in Rem-mer announced a special rule dealing with jury tampering”). Moreover, unlike the communications at issue in either Mattox or Remmer, N.L.’s declaration contained no allegation that the alleged contact between Juror 10 and the “judge up north” concerned “the matter pending before the jury” such as Godoy’s guilt or innocence or a verdict the jury should render. Remmer, 347 U.S. at 229, 74 S.Ct. 450; Mattox 146 U.S. at 142-43, 13 S.Ct. 50. Admittedly, we have held that Mattox’s, presumption of prejudice may apply irrespective of a communication’s content where the unauthorized communication is “between a juror and a witness or interested party.” Caliendo v. Warden of Cal. Men’s Colony, 365 F.3d 691, 696 (9th Cir. 2004). But even this *1087 ruling is little help to Godoy, since the “judge up north” who allegedly responded to Juror 10’s texting was neither a witness nor otherwise interested in Godoy’s trial. Nor does the juror misconduct alleged by Godoy involve a “continuous and intimate association” between a juror and anyone participating in Godoy’s trial. Turner, 379 U.S. at 473, 85 S.Ct. 546. “Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court’s precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.” White, 134 S.Ct. at 1706.
Subsequent to argument in Godoy’s case, however, our Court decided Tarango v. McDaniel, 815 F.3d 1211 (9th Cir. 2016). In Tarango, we stated that Mattox “compels a criminal trial court to consider the prejudicial effect of any external contact that has a ‘tendency’ to influence the verdict.” Id. at 1221 (citing Mattox, 146 U.S. at 150-51, 13 S.Ct. 50). We held further that a tendency to influence the verdict exists per se and triggers a presumption of prejudice whenever there is “unauthorized external contact between a juror and a government agent, whose official position ‘beyond question carries great weight with a jury.’ ” Id. at 1223 (quoting Parker v. Gladden, 385 U.S. 363, 365, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (per curiam)).
We question the correctness of Taran-go’s broad holding, especially in light of the Supreme Court’s admonitions to “lower courts — and the Ninth Circuit in particular — against ‘framing our precedents at ... a high level of generality.’ ” Lopez v. Smith, — U.S.-, 135 S.Ct. 1, 4, 190 L.Ed.2d 1 (2014) (per curiam) (quoting Nevada v. Jackson, — U.S.-, 133 S.Ct. 1990, 1994, 186 L.Ed.2d 62 (2013) (per curiam)). Because we are bound by Taran-go, however, we assume that Godoy was entitled to a presumption of prejudice under clearly established federal law.
2
Even assuming a presumption of prejudice applies in Godoy’s case, however, we have little trouble holding that the California Court of Appeal’s analysis did not unreasonably apply clearly established federal law by concluding the government had rebutted the presumption.
When considering Godoy’s claim, the Court of Appeal first noted that under California law “[j]ury misconduct raises a rebuttable presumption of prejudice,” and assessed Godoy’s claim in a section of its opinion entitled “Juror Misconduct: Presumption of Prejudice.” The court also identified in no uncertain terms that Go-doy’s argument centered on his assertion that “the judgment must be reversed because the People did not rebut th[e] presumption,” and responded by concluding that the government had indeed carried its burden. The court first observed — in accordance with the government’s argument to the trial court — that N.L. had no personal knowledge of jury deliberations due to his role as an alternate. Moreover, the court noted that although N.L.’s declaration vaguely asserted that Juror 10’s communications involved questions about “what was going on,” neither that ambiguous assertion nor anything else in N.L.’s declaration actually stated that “the ‘judge friend’ communicated information prejudicial to” Godoy or the prosecution. Finally, the court reasoned that, when read in the fairest light, N.L.’s declaration suggested that any information furnished by Juror 10’s “judge friend” related to “procedural matters,” not Godoy’s guilt or innocence. On any plain reading of the record, it cannot be said that the court misallocated the burden to Godoy or unreasonably applied Supreme Court precedent.
*1088 In spite of the clear text of the Court of Appeal’s opinion, Godoy argues that the court’s application of the presumption of prejudice unreasonably applied Supreme Court precedent because the court did not “take testimony.” The dissent likewise argues that the state court’s decision was contrary to Remmer because the government failed to introduce additional “contrary evidence.” Dissent at 1095. Those arguments also fail. Neither Remmer nor any other case requires that the government present testimony or any other new evidence to rebut the presumption of prejudice created by juror misconduct. Indeed, Remmer says only that the government is required to “establish ... that [the] contact with the juror was harmless” — it says nothing about any requirement that the government present affirmative evidence to rebut the presumption. Remmer, 347 U.S. at 229, 74 S.Ct. 450; see also Mattox, 146 U.S. at 150, 13 S.Ct. 50 (stating only that the presumption is rebutted where the “harmlessness [of juror misconduct] is made to appear”).
The dissent points to RemmePs observation that the “burden rests heavily on the Government” as clearly establishing that the government must present evidence to carry its burden. Dissent at 1096. But Remmer does not compel the dissent’s conclusion that this means the government maintains a heavy burden to produce evidence to defeat the defendant’s claim of juror misconduct. To the contrary, the observation can quite reasonably be read to mean that the government bears a burden to persuade the court that there was no prejudice. Thus, if the court cannot determine the nature of the alleged prejudice, the presumption means that the tie goes to the defendant. But that does not mean that the government can prevail only by ferreting out new evidence, rather than (as was done here) by pointing to evidence already within the existing record that contradicts the notion of prejudice.
In short, nothing in Remmer or elsewhere comes close to establishing that the California Court of Appeal erred “beyond any possibility for fairminded disagreement” in concluding that the government had satisfied its burden on the basis of the existing record. Harrington, 562 U.S. at 103, 131 S.Ct. 770. The Court of Appeal did not unreasonably apply clearly established federal law in concluding the presumption had been rebutted.
3
Godoy next argues that, even granting that the Court of Appeal applied a presumption of prejudice consistent with clearly established federal law, it nonetheless unreasonably determined the facts because it “inexplicably” failed to consider the additional evidence on direct appeal that Godoy offered in his habeas petition, and instead merely “speculated” about the harmlessness of Juror 10’s alleged misconduct. Again, we disagree.
The Court of Appeal clearly stated that it limited its discussion to N.L.’s declaration because this was “the only evidence before the [trial] court.” See People v. Waidla, 22 Cal.4th 690, 94 Cal.Rptr.2d 396, 996 P.2d 46 (2000) (observing that “[appellate jurisdiction is limited to the four corners of the [underlying] record on appeal” (quoting In re Carpenter, 9 Cal.4th 634, 38 Cal.Rptr.2d 665, 889 P.2d 985, 992 (2000))). Furthermore, even if the court were to have considered the expanded record— which, incidentally, it did when considering and rejecting Godoy’s habeas petition— there would have been no difference in the result. The only differences between the record before the California Court of Appeal on direct review and on habeas review were the declaration of alternate juror E.M. and supporting declarations of trial and appellate counsel. Contrary to Godoy’s *1089 assertion, however, this additional evidence adds nothing to his claim.
E.M.’s declaration contained the same allegations as N.L.’s, stating in broad terms that “throughout the trial,” Juror 10 communicated “about the case” with her “ ‘judge Mend’ up north.” Yet unlike N.L., E.M. also recounted the specifics of several communications between Juror 10 and her “judge Mend.” According to E.M., “Juror 10’s judge Mend told her that she should write a note to give Judge Sheldon so that she would be excused from jury duty. Juror 10 did write a note which she gave to Judge Sheldon.” Similarly, E.M. stated that when “jurors learned that Judge Sheldon had to leave for a medical procedure!,] Juror 10’s judge Mend told her that if our trial judge had to be absent, that another judge would take his place. That, in fact, occurred.” We fail to see how the court’s decision constituted an unreasonable determination of the facts, especially when the additional evidence highlighted by Godoy further bolsters the court’s conclusion that such communications were not a source of prejudice.
Because the Court of Appeal did not act contrary to or unreasonably apply clearly established federal law when analyzing prejudice, Godoy is not entitled to relief on this ground.
B
Godoy next argues that the Court of Appeal unreasonably applied clearly established federal law when it concluded that the state trial court was within its discretion in refusing Godo/s request for an additional evidentiary hearing to investigate his juror misconduct claim. Contrary to Godoy’s assertions, however, neither Remmer nor Smith v. Phillips, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), clearly establish that Godoy was entitled to any hearing beyond what he already received.
l
As we have already explained, in Rem-mer the Supreme Court found a criminal defendant’s right to an impartial jury was violated where a trial court dismissed allegations of juror misconduct after an ex parte meeting with prosecutors. Remmer, 347 U.S. at 228-29, 74 S.Ct. 450. In that context, the Supreme Court sensibly held that a trial court “should' not decide and take final action ex parte,” but instead should “determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.” Id. at 229-30, 74 S.Ct. 450 (emphasis added). We have observed elsewhere that such a holding “provides little prospective guidance as to when a hearing is required or even appropriate.” Sims v. Rowland, 414 F.3d 1148, 1154 (9th Cir. 2005). Indeed, a “plausible reading posits that the Remmer Court merely condemned the ex parte manner in which the trial judge and the prosecutor handled the situation without the knowledge of the defendant or his counsel.” Id.
In Smith v. Phillips, a defendant claimed that his convictions for multiple counts of murder and attempted murder should be vacated because a juror in his case had submitted an application to work as an investigator in the district attorney’s office. 455 U.S. at 212, 102 S.Ct. 940. Following the verdict, the district attorney learned of the juror’s application and informed the trial court and Smith’s attorney. Id. at 213, 102 S.Ct. 940. At a post-trial hearing, the trial court heard testimony from the juror and determined that although the letter of application was an “indiscretion,” -it did not improperly influence the juror’s vote. Id. at 213-14, 102 S.Ct. 940. A federal district court granted the defendant’s habeas petition and the Second Circuit affirmed, holding that the *1090 failure of the prosecuting attorneys to alert the court of the juror’s application when they first learned of it violated due process. Id. at 214, 102 S.Ct. 940. The Supreme Court reversed.
Focusing its analysis on the adequacy of the hearing conducted after the trial, the Court concluded that the trial judge’s investigation of the allegations of juror misconduct sufficiently protected the defendant’s due process rights. Id. at 215-18, 102 S.Ct. 940 (“This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.”). In so holding, however, the Court declined to establish a rule requiring a separate hearing whenever there are allegations of juror misconduct. Rather, the Court explained, “Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.” Id. at 217, 102 S.Ct. 940 (emphasis added). The Court has recently reiterated this rule, stating that a “suggestion of prejudice” should prompt courts to “determine whether any juror has been directly tainted.” Dietz v. Bouldin, — U.S.-, 136 S.Ct. 1885, 1894, 195 L.Ed.2d 161 (2016).
Notably absent from these cases is any strict requirement to hold an evidentiary hearing in the course of the court’s investigation into prejudice. As we have recognized, “Remmer and Smith do not stand' for the proposition that any time evidence of juror bias comes to light, due process requires the trial court to question the jurors alleged to have bias.” Tracey v. Palmateer, 341 F.3d 1037, 1044 (9th Cir. 2003). Instead, we have concluded on several occasions that Remmer and Smith leave trial courts with flexibility to determine when an evidentiary hearing is appropriate.
Our previous precedents illustrate the “flexible rule” governing a court’s investigation of juror misconduct that Remmer and Smith established. Id. at 1044. For instance, in Tracey, a petitioner claimed the state court violated clearly established federal law when it failed to question several jurors who had told another juror before and after voir dire that they “felt [the defendant] was guilty” and questioned whether there was “any question in reference to the verdict.” Id. at 1039. We held that the trial court’s decision not to question these jurors was not contrary to Rem-mer or Smith, because the court complied with Smith’s command to “determine the effect of [prejudicial] occurrences when they happen” by examining the statements- and concluding that the “nature and timing of the bias” was insufficient to necessitate further inquiry. Id. at 1044^45 (quoting Smith, 455 U.S. at 217, 102 S.Ct. 940 (alteration added)).
Likewise, in Sims, we held that neither Remmer nor Smith demand that a judge conduct a hearing sua sponte into allegations of juror misconduct. 414 F.3d at 1155. In so holding, we again concluded that “Smith and Remmer do not stand for the proposition that a hearing is required in every case of potential juror bias.” Id. We also noted that the “flexible rule” evinced by Remmer and Smith reflects our own circuit precedent that a court should “ ‘consider the content of the allegations, the seriousness of the'alleged misconduct or bias, and the credibility of the source’ when determining whether a hearing is required.” Id. at 1155 (quoting Tracey, 341 F.3d at 1044).
2
In light of the Supreme Court’s precedents and our past reading of them, we have little trouble concluding that the Court of Appeal did not err “beyond any *1091 possibility for fairminded disagreement” in ruling that no further hearing was required.
In its opinion, the California Court of Appeal noted that the trial court possessed “discretion” over whether to hold an evi-dentiary hearing, and that such a hearing “should be held only where the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred.” The Court of Appeal then concluded that the trial court properly reasoned that such a showing was absent in Godoy’s case, because N.L. was an alternate juror with no personal knowledge of jury deliberations and because the alleged communications between the absent judge and Juror 10 “related to procedural matters rather than appellant’s guilt.” We hardly think such a conclusion was unreasonable, not least because the trial court’s actions clearly fell within the “flexible” parameters the Supreme Court’s cases demarcate. Tracey, 341 F.3d at 1044.
Moreover, Godoy did have the opportunity to present testimony in favor of his juror misconduct claim. Prior to the first hearing on Godoy’s motion for a new trial, Godoy’s lawyer stated that he would “present live witness testimony or declarations from [the] jury panel at the time of the hearing” about Juror 10’s misconduct. Yet Godoy’s counsel failed to provide the prosecution any information on the witnesses he planned to call despite a promise to do so. Nor did he provide any declaration or other information to the court stating what the content of his witness’s testimony would be. He simply showed up at the hearing and insisted that E.M. should be permitted to testify. After expressing concern about the prosecutor’s lack of discovery and the uncertain admissibility of E.M.’s testimony since he had “no idea what [she] may testify to,” the trial judge decided not to “hear testimony from [E.M.] today.” Instead, he ordered a continuance and instructed Godoy’s counsel to provide the names of any potential witnesses to the prosecutor “well in advance” of the next hearing.
Godoy’s counsel never provided a declaration from E.M. Roughly one week before the rescheduled hearing, however, he sent an affidavit from N.L. to the prosecutor and the court. Yet on the day of the hearing, Godoy’s counsel admitted that he was “not prepared” and that he had not brought N.L. to the hearing because he assumed the court would grant his motion for an additional continuance which he filed the day before. During the course of the conversation, the court repeatedly asked Godoy whether he had “any other juror’s affidavit” in addition to N.L.’s that he wished to submit. Godoy’s counsel admitted he did not, but complained that the judge “refused to allow the sworn testimony” of E.M. at the last hearing. In response, the judge explained that under California law, he was obligated to examine an affidavit of any juror to determine whether the juror’s statements would be admissible before he could consider their merits. Having examined N.L.’s declaration, the trial judge then denied Godoy’s motion for a new trial.
There is little doubt that the trial court here did everything required by Smith and Remmer to “determine the effect of [prejudicial] occurrences when they happen.” Smith, 455 U.S. at 217, 102 S.Ct. 940 (alteration added). Indeed, the trial court gave Godoy’s counsel not one but two chances to present testimony from E.M., N.L., or any other juror. He failed to take advantage of either opportunity. Moreover, the trial court “considered] the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source” insofar as he reviewed N.L.’s declaration and concluded no fur *1092 ther inquiry was necessary. United States v. Angulo, 4 F.3d 843, 847 (9th Cir. 1993). In light of such facts, we can hardly conclude that the trial court acted unreasonably, much less in a way that contravened “clearly established Federal law.” 28 U.S.C. § 2254(d)(1).
The dissent argues that the trial court transgressed, clearly established federal law when it concluded that Godoy was not entitled to a separate evidentiary hearing because he failed to demonstrate a “strong possibility” that prejudicial misconduct occurred. Dissent at 1100. But we fail to see how the court’s application of this standard or any other makes any difference, since here the trial court undisputably “determine[d] ... whether or not [the communication] was prejudicial, in a hearing with all interested parties permitted to participate.” Remmer, 347 U.S. at 230, 74 S.Ct. 450. Moreover, we are mystified by the dissent’s insistence that the trial court’s investigation was not “reasonably calculated to resolve the doubts raised about the juror’s impartiality.” Dissent at 1103 (quoting Dyer v. Calderon, 151 F.3d 970, 974-75 (9th Cir. 1998) (en banc)). The trial judge held not one but two hearings on Godoy’s allegations of juror misconduct, reviewed the affidavit submitted by Godoy’s counsel, and heard from the parties’ counsel before determining that there was no prejudice. Likewise, the dissent’s assertion that the trial court “showed no willingness to permit ... live testimony” is incredible. Dissent at 1104. The trial court said in no uncertain terms that it was ready to “hear testimony from” E.M. but for the failure of Godoy’s counsel to comply with basic rules of evidence, and surely would have done so had Godoy’s counsel brought E.M. or N.L. to the second hearing.[3] We simply do not believe that Remmer, Smith, or any other decision mandates additional hearings ad infinitum because defense counsel fails to offer evidence he is invited to present. As such, we decline Godoy’s invitation to review his claim de novo or to overturn the denial of his habeas petition on this ground.
IV
Godoy lastly argues that he is entitled to habeas relief despite the demanding requirements of § 2254(d) because the trial court unreasonably denied his request for a third continuance. Because Godoy’s argument misunderstands Supreme Court precedent and fails to clear the high bar of AEDPA, he is not entitled to relief on this ground.
Trial courts have “broad discretion” in determining whether continuances should be granted, and “only an unreasoning and arbitrary ‘insistence upon expeditiousness in the face of a justifiable request for delay’ ” is constitutionally impermissible. Morris v. Slappy, 461 U.S. 1, 11-12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) (quoting Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964)). Further, even if a trial court abus *1093 es its discretion in denying a continuance, a habeas petitioner must show actual prejudice to obtain relief. See Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Here, the California Court of Appeal reasonably concluded that, in light of the relevant circumstances, the trial court did not abuse its discretion when it denied Godoy’s motion for a continuance.
The Supreme Court has explicitly stated that there are “no mechanical tests” in deciding whether a denial of a continuance violates due process. Ungar, 376 U.S. at 589, 84 S.Ct. 841. Instead, “[t]he answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.” Id. Godoy cites several Ninth Circuit cases to contend that we must balance certain specific factors in order to determine whether a denial of continuance was fair and reasonable. But Ninth Circuit cases are not “clearly established Federal law, as determined by the Supreme Court of the United States,” and thus their holdings do not establish any binding test for AEDPA’s purposes. 28 U.S.C. § 2254(d)(1); see Glebe v. Frost, — U.S.-, 135 S.Ct. 429, 431, 190 L.Ed.2d 317 (2014).
Moreover, circuit precedent cannot be used to “refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.” Marshall v. Rodgers, — U.S. -, 133 S.Ct. 1446, 1450, 185 L.Ed.2d 540 (2013); Lopez, 135 S.Ct. at 2 (“We have emphasized, time and again, that [AEDPA] prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is ‘clearly established.’ ”). The Supreme Court’s command in Ungar that a denial of a continuance must be assessed in light of “circumstances present in every case” cannot be refined by Ninth Circuit precedent into a specific review that looks only at certain factors. Instead, the correct question is whether the California Court of Appeal reasonably concluded that the trial court did not abuse its broad discretion when it denied Godoy’s continuance. In light of the circumstances and reasons presented to the trial judge in this case, we find no such error in the Court of Appeal’s decision.
In his motion for a continuance, defense counsel’s sole argument was that he was busy with a separate murder trial and had no time to prepare a response to the prosecution’s supplemental opposition to his motion for a new trial. The trial judge summarily denied the motion based upon the fact that there was “no legal cause stated.” Thereafter, the Court of Appeal observed that Godoy’s counsel had failed to explain sufficiently “why he had been unable to review the first supplemental opposition when he was not actually in court.” It further noted that Godoy’s counsel was in trial for ten hours and five minutes during the six days between the date when he received the supplemental opposition and the date when he filed his motion for a thirty-day continuance. Likewise, the Court of Appeal remarked that Godoy’s attorney did not indicate that either his case at trial or the issues raised by the prosecutor’s supplemental opposition was especially demanding or complex.
Godoy argues that it is common knowledge that trial attorneys must spend many hours out of court preparing for in-court hearings and trials. He also claims that his attorney could not divulge his particular reasons for being unable to prepare for the motion without disclosing information protected by work product or attorney-client privilege. However, Godoy’s counsel never contended that detailing the reasons for his inability to prepare for the hearing would require him to divulge confidential information. See Hernandez v. Holland, *1094 750 F.3d 843, 859 (9th Cir. 2014) (noting that although counsel requested a continuance due to “conflicts” and “serious issues,” there was no basis to find that denial of continuance was unreasonable since “counsel did not state the nature of the conflicts or serious issues” and did not request an ex parte hearing to “give some substance to his conclusory claims” (internal quotations omitted)). Additionally, the trial judge had already granted two continuances prior to the denial of defense counsel’s June 28, 2006 motion, one at the request of Godoy’s lawyer and another necessitated by his failure to disclose promised information to the prosecutor. Those continuances had already delayed the sentencing date over two months.[4]
In short, the trial judge had several reasons for denying the motion for a continuance that were neither unreasonable nor arbitrary. In light of the broad discretion accorded to trial courts, a fairminded jurist could easily conclude that the state Court of Appeal’s affirmance of the trial judge’s denial of Godoy’s motion for a continuance was not unreasonable.
V
Because Godoy has failed to demonstrate that his claims warrant federal ha-beas relief, the judgment of the district court is
AFFIRMED.

. During its initial consideration of the case, the Supreme Court speculated that "[t]he sending of an F.B.I. agent in the midst of a trial to investigate a juror as to his conduct is bound to impress the juror and is very apt to do so unduly.” Remmer, 347 U.S. at 229, 74 S.Ct. 450. Having granted certiorari a second time, however, the Court observed that the district court's subsequent investigation made plain that the F.B.I. interview was not in fact a source of prejudice. Rather, it was the initial bribery offer that rendered the juror "a disturbed and troubled man,” and the F.B.I. interview merely failed to "disperse the cloud created by” this offer. Remmer II, 350 U.S. at 381-82, 76 S.Ct. 425.

. The dissent attempts to minimize the trial court's concern over the admissibility of N.L.’s testimony by pointing to a provision from the California Evidence Code allowing for the introduction of “statements ... of such a character as is likely to have influenced the verdict improperly.” Dissent at 1104 n.10 (quoting Cal. Evid. Code § 1150). Yet this provision highlights rather than undermines the trial court's position, as it specifically states that only "otherwise admissible evidence” concerning juror misconduct may be considered. Cal. Evid. Code § 1150. Further, California precedent cited by the trial court clearly states that section 1150 mandates that a court must "first determine whether the affidavits supporting the motion [for a new trial] are admissible” before considering a juror's substantive testimony. People v. Perez, 4 Cal.App.4th 893, 906, 6 Cal.Rptr.2d 141 (1992).

. The trial judge indirectly referenced these continuances in his denial of counsel's motion for continuance, commenting "It's been several months since this conviction, and I’m going forward today.” Although the Court of Appeal did not explicitly mention these continuances in its decision, we think it evident that it considered them insofar as it observed that to obtain a continuance counsel must demonstrate that he "prepared for trial with due diligence.”